**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANK BUONO,
                    *Plaintiff-Appellee,*

v.

DIRK KEMPTHORNE,* Secretary of
the Interior, in his official
capacity; JONATHAN B. JARVIS,
Regional Director, Pacific West
Region, National Park Service,
Department of the Interior, in his
official capacity; DENNIS SCHRAMM,
Superintendent, Mojave National
Preserve, National Park Service,
Department of the Interior, in his
official capacity,
                    *Defendants-Appellants.*

No. 05-55852

D.C. No.
CV-01-00216-RT

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Robert J. Timlin, Senior Judge, Presiding

Argued and Submitted
April 9, 2007—Pasadena, California

Filed September 6, 2007
Amended May 14, 2008

*Dirk Kempthorne is substituted for his predecessor Gail Norton as
Secretary of the Department of the Interior. Dennis Schramm is substi-
tuted for his predecessor Mary Martin as the Superintendent of the Mojave
National Preserve. See Fed. R. App. P. 43(c)(2).

5493

Before: Betty B. Fletcher and M. Margaret McKeown, Circuit Judges, and Ronald M. Whyte,** District Judge.

Opinion by Judge McKeown

---

**The Honorable Ronald M. Whyte, United States District Judge for the Northern District of California, sitting by designation.

## COUNSEL

Sue Ellen Wooldridge, Kathryn E. Kovacs, United States Department of Justice, Washington, D.C., for the defendants-appellants.

Peter J. Eliasberg, Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, California, for the plaintiff-appellee.

Steven W. Fitschen, Colleen M. Holmes, The National Legal Foundation, Virginia Beach, Virginia, for amicus curiae The National Legal Foundation.

---

## ORDER

The opinion filed September 6, 2007, slip op. 11793, and appearing at 502 F.3d 1069, is amended as follows:

1. At slip op. 11816, footnote 13, delete "Although the Seventh Circuit adopted a presumption that "a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion" in the absence of "unusual circumstances," *Marshfield*, 203 F.3d at 491, we decline to adopt such presumption. The Supreme Court's Establishment Clause jurisprudence recognizes the need to conduct a fact-specific inquiry in this area" and substitute: "The Seventh Circuit stated that "[a]bsent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion. We are aware, however, that adherence to a formalistic standard invites manipulation. To avoid such manipulation, we look to the substance of the transaction as well as its form to determine whether government action endorsing religion has actually ceased." *Marshfield*, 203 F.3d at 491. Read as a whole, the Seventh Circuit position looks at the issue on a transaction-by-transaction basis. We agree with this approach. However, to the extent that *Marshfield* can be read to adopt a presumption of the effectiveness of a land sale to end a constitutional violation, we decline to adopt such a presumption. The Supreme Court's Establishment Clause jurisprudence recognizes the need to conduct a fact-specific inquiry in this area."

With this amendment, the panel has voted to deny Defendants-Appellants petition for panel rehearing. Judge McKeown votes to deny the petition for rehearing en banc and Judges B. Fletcher and Whyte so recommend.

The full court has been advised of Defendant-Appellant's petition for rehearing en banc, and a judge of this court requested a vote on whether this case should be reheard en banc; however, a majority of the active judges did not vote in favor of en banc consideration. Fed. R. App. P. 35. Judge Reinhardt was recused from considering the en banc issues in this case and did not participate in the court's decision.

The petition for panel rehearing and the petition for rehearing en banc are denied. No further petitions for rehearing will be entertained.

---

O'SCANNLAIN, Circuit Judge, dissenting from the denial of rehearing en banc, joined by TALLMAN, BYBEE, CALLAHAN, and BEA, Circuit Judges:

The opinion in this case announces the rule that Congress cannot cure a government agency's Establishment Clause violation by ordering sale of the land upon which a religious symbol previously was situated. Because such a novel rule contravenes governing Supreme Court precedent, creates a split with the Seventh Circuit on multiple issues, and invites courts to encroach upon private citizens' rights under both the speech and religion clauses of the First Amendment, I respectfully dissent from our order rejecting rehearing *en banc*.

I

Seventy-four years ago, the Veterans of Foreign Wars ("VFW") erected atop Sunrise Rock in the Mojave National

Preserve[1] a memorial to veterans who died in World War I. *Buono v. Kempthorne*, 502 F.3d 1069, 1072 (9th Cir. 2007) ("*Buono IV*"). The memorial took the form of a cross, by which stood a wooden sign stating, "The Cross, Erected in Memory of the Dead of All Wars," and "Erected 1934 by Members of Veterans of Fore[ig]n Wars, Death Valley post 2884." *Id*. The sign has since disappeared, and the cross has been replaced several times, most recently in 1998. *Id*. Each incarnation of the memorial was created and installed by private citizens; there is no indication in the record that the citizens ever received permission from the National Park Service ("NPS") to construct the memorial. *Id*.

In 2002, Frank Buono, a retired NPS employee, brought suit against the Department of the Interior, seeking to enjoin the continued presence of the cross on federal land. *Buono v. Norton*, 212 F. Supp. 2d 1202, 1204 (C.D. Cal. 2002) (*Buono I*). The district court determined that the presence of the cross on federal land violated the Establishment Clause, and entered an injunction ordering the government to remove the cross. *Id*. at 1217.

During the pendency of the appeal from *Buono I*, Congress enacted legislation ordering the Secretary of the Interior to convey a one-acre parcel of land including Sunrise Rock to the VFW in exchange for a parcel of privately-owned land of equal value. Pub. L. No. 108-87, § 8121(a)-(f), 117 Stat. 1054, 1100 (2003) ("Section 8121"). The transfer was conditioned on the VFW's obligation to "maintain the conveyed property as a memorial commemorating United States participation in World War I and honoring the American veterans of that war."[2] § 8121(e). Under the terms of the statute, the gov-

---

[1]The Mojave National Preserve is a national park that encompasses approximately 1.6 million acres of land in Southern California, approximately 90 percent of which is owned by the federal government. *Buono IV*, 502 F.3d at 1072.

[2]In legislation previously enacted in 2002, Congress designated "[t]he five-foot-tall white cross first erected by the [VFW] in 1934" a "national

ernment retained a reversionary interest in the property "[i]f the Secretary determines that the conveyed property is no longer being maintained as a war memorial." *Id.* Critically, however, section 8121 did not mention the existence of a cross on Sunrise Rock, nor did it require that the VFW retain the cross as part of the memorial.

The agreement also provided that "the Secretary shall continue to carry out the responsibilities of the Secretary under" Pub. L. No. 107-117 § 8137, 115 Stat. 2230 (2002). § 8121(a). Section 8137 required the Secretary to "use not more than $10,000 of funds available for the administration of the Mojave National Preserve to acquire a replica of the original memorial plaque and cross placed at the national World War I memorial." Section 8137 does not confer any other authority or obligation on the government.

Soon after the enactment of section 8121, but before the land exchange had been carried out, we affirmed the district court's determination that the presence of the cross on federal land violated the Establishment Clause. *Buono v. Norton*, 371 F.3d 543, 550 (9th Cir. 2004) ("*Buono II*"). However, we expressly refused to consider "whether a transfer completed under section 8121 would pass constitutional muster." *Id.* at 546.

Following *Buono II*, the government completed the land exchange. Buono then brought the present action, arguing that section 8121 violated the district court's injunction or, in the alternative, that the land transfer itself violated the Establishment Clause. *See Buono v. Norton*, 364 F. Supp. 2d 1175,

memorial commemorating United States participation in World War I and honoring the American veterans of that war." Pub. L. No. 107-117, § 8137, 115 Stat. 2230, 2278-79 (2002) ("Section 8137"); *see also* Pub. L. No. 107-248, § 8065(b), 116 Stat. 1519, 1551 (2002) (barring the use of federal funds "to dismantle national memorials commemorating United States participation in World War I").

1177 (C.D. Cal. 2005) ("*Buono III*"). The district court held that the government continued to violate the injunction following the land transfer, even though ownership of the cross and the underlying land had been transferred to a private party. *See id.* at 1182. Significantly, the district court therefore concluded that "it need not consider [Buono's] other contention that the land transfer itself is an independent violation of the Establishment Clause." *Id.* at 1182 n.8.

The *Buono IV* panel affirmed, holding that the predivestment injunction remained enforceable because the government continued impermissibly to endorse religion despite the transfer of Sunrise Rock. *Buono IV*, 502 F.3d at 1086. The panel determined that such endorsement existed because: (1) the government purportedly retained control and oversight over Sunrise Rock, *id.* at 1082-83; (2) the government failed to hold an open bidding process for the land, *id.* at 1084-85; (3) the government purportedly had engaged in "long-standing efforts to preserve and maintain the cross," *id.* at 1085; and (4) the government continued to endorse religion by permitting the cross at the site, *id.* at 1085-86.[3]

II

*Buono IV* squarely contradicts two Seventh Circuit opinions holding that "[a]bsent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion." *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 491 (7th Cir. 2000) (upholding the sale of a portion of a municipal park on which stood a statue of Jesus with arms extended);

---

[3]I note that the constitutionality of the transfer itself is not at issue in this case. Because the district court solely concluded that state action persisted and therefore expressly declined to consider whether "the land transfer itself is an independent violation of the establishment clause," *Buono III*, 364 F. Supp. 2d at 1182 n.8, the *Buono IV* opinion presupposes that the transfer is not independently violative.

*see also Mercier v. Fraternal Order of Eagles*, 395 F.3d 693, 702-03 (7th Cir. 2005) (upholding the sale of a portion of a municipal park with monument of Ten Commandments). The Seventh Circuit properly applied the principle that once publicly-owned land is transferred to a private party, government action ceases, and the Establishment Clause violation necessarily goes with it. *Marshfield*, 203 F.3d at 491 ("Because of the difference in the way we treat private speech and public speech, the determination of whom we should impute speech onto is critical.").

The "unusual circumstances" exception noted by the Seventh Circuit therefore merely incorporated well-established Supreme Court precedent concerning when state action may be imputed to private parties despite the transfer of once-public land: a continuation of state action may be found "when a set of unusual facts and circumstances demonstrate[ ] that the government remain[s] intimately involved in exclusively public functions that ha[ve] been delegated to private organizations." *Id.* at 492 (citing *Evans v. Newton*, 382 U.S. 296 (1966); *Terry v. Adams*, 345 U.S. 461 (1953); *Marsh v. Alabama*, 326 U.S. 501 (1946)). That is, state action may be imputed to private parties in the "extraordinary circumstance[ ]" that the "transfer [has not] eliminated the actual involvement of the [government] in the daily maintenance and care of the [property]." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 159 n.8 (1978) (discussing *Evans*, 382 U.S. at 301); *see Marshfield*, 203 F.3d at 492.

Under such precedent, the only relevant issue is whether there is continuing state action, absent which the government's intent or any atypical circumstances are of no consequence. *See Marshfield*, 203 F.3d at 491; *see also Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779 (1995) (O'Connor, J., concurring) ("[A]n Establishment Clause violation must be moored in government action of some sort."); *Bd. of Educ. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion) ("[T]here is a crucial difference

between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.") (emphasis in original). Indeed, the court in *Marshfield* upheld the relevant land sale despite the appellants' contention that it was a " 'sweetheart deal' . . . concocted to circumvent the government action requirement," precisely because the sale extinguished state action. 203 F.3d at 491; *see also Mercier*, 395 F.3d at 702 (rejecting the argument that the transfer was unconstitutional because "[t]he City Council knew that it was faced with a lawsuit seeking the removal of the Monument").

Nevertheless, the *Buono IV* opinion splits from the Seventh Circuit's rule and from binding Supreme Court precedent by creating an "unusual circumstances" test that extends well beyond the limited circumstances in which state action persists. That is, *Buono IV* improperly faults the government for:

- (1) Having the purported authority to control Sunrise Rock, despite the utter lack of evidence that it would actually contribute to the maintenance and care of the memorial;

- (2) Possessing the intent to preserve the Sunrise Rock memorial, even though such consideration is irrelevant absent state action; and

- (3) Failing to hold an open bidding process, even though *Marshfield* and the *Evans* line of cases demonstrate that state action ceases once Sunrise Rock is privately owned.

What is altogether missing in this case is *any* evidence that the government has maintained or will maintain or support the Sunrise Rock cross after the land transfer.[4] *See Evans*, 382

---

[4]As *Marshfield* plainly suggests, the reversionary clause in section 8121 does not constitute state action where the government has not "made any effort to enforce [it]." 203 F.3d at 492-93.

U.S. at 301 (relying on the fact that, following the government's resignation as trustee over the relevant land, "there has been no change in municipal maintenance and concern over [it]," such that "[w]hether these public characteristics will in time be dissipated is wholly conjectural"); *Marshfield*, 203 F.3d at 493 (declining to conjecture on "the conduct of the parties following the sale of [the] property").

Accordingly, while the *Buono IV* opinion pays lip service to the "unusual circumstances" exception mandated by the *Evans* line of cases, it has bestowed upon judges the extraordinary authority to enjoin private parties from displaying religious symbols on their own land based solely on the government's pre-divestment conduct, absent any showing that the government would remain "intimately involved" in the care and maintenance of privately-owned land.

Moreover, the deference owed to Congress forecloses us from striking down legislation based upon a presumption that the government will violate the Constitution in the future. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it."); *see also Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1190 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."); *INS v. St. Cyr*, 533 U.S. 289, 200 n.12 (2001) ("[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.") (internal quotation marks omitted). By holding that the district court could invalidate section 8121 without a finding that the government would remain "intimately involved" in the maintenance and care of the Sunrise Rock memorial post-divestment, the *Buono IV* opinion flouts

such "fundamental principle of judicial restraint." *Wash. State Grange*, 128 S. Ct. at 1191.

### III

*Buono IV* also splits from the Seventh Circuit on a second, equally important issue. After holding that the government failed the *Lynch* endorsement test by inadequately distancing itself from the Sunrise Rock memorial, the opinion upholds a remedy compelling the VFW to sacrifice *its* private rights in Sunrise Rock to cure the *government*'s constitutional violation. *Buono IV*, 502 F.3d at 1085-86; *see also Buono II*, 371 F.3d at 548-49 (discussing *Lynch v. Donnelly*, 465 U.S. 668 (1984)).

Yet the Seventh Circuit correctly held that a private party's rights may not be brushed aside to remedy the government's violative conduct; rather, the only proper remedy is to enjoin the government's improper conduct. *See Marshfield*, 203 F.3d at 497 ("[E]ither the Fund, a private land owner, must be estopped from exercising its right to free exercise and freedom of speech on its own property, or some way must be found to differentiate between property owned by the Fund and property owned by the City. The latter—not the former— is the appropriate solution."). Indeed, on remand in *Marshfield*, the district court required that the government erect a fence around the statue; the statue, however, was permitted to remain on the now-private property, precisely because of the protection owed to the private landowner under the First Amendment. *See Freedom From Religion Found., Inc. v. Marshfield*, No. 98-C-270-S, 2000 WL 767376 (W.D. Wis. May 9, 2000).

By holding that a private citizen's rights may be infringed simply because his land was publicly owned in the past, or because it presently sits next to publicly-owned land, or because a hypothetical viewer might mistakenly confuse it with such land, the *Buono IV* opinion recklessly splits from

the Seventh Circuit and announces a broad and unprecedented rule that should not be allowed to stand.[5]

## IV

Moreover, while the *Buono IV* opinion concludes that the government will continue to endorse religion even after transferring Sunrise Rock to the VFW, the opinion fails even to *mention* the government's argument that the pre-divestment injunction was mooted by the Supreme Court's intervening decisions in *McCreary County v. ACLU*, 545 U.S. 844 (2005), and *Van Orden v. Perry*, 545 U.S. 677 (2005). Because the central considerations in *Van Orden* are almost entirely on point with the facts of *Buono IV*, such precedent forecloses the continued enforcement of the injunction.

As was the case in *Van Orden*, the Sunrise Rock memorial was constructed by a private, secular organization—indeed, the memorial in this case was installed without government permission—away from a captive audience, and both were packaged with a "nonsectarian text" evincing a clearly secular purpose. *Van Orden*, 545 U.S. at 701-02 (Breyer, J., concurring). Moreover, just as Justice Breyer's controlling concurrence in *Van Orden* found dispositive that the Ten Commandments statue had existed for 40 years before the underlying suit, the Sunrise Rock cross has existed for nearly *double* that amount of time. *See id.* at 702 ("As far as I can tell, 40 years passed in which the presence of this monument, legally speaking, went unchallenged . . . [T]hose 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting . . . to a govern-

---

[5]Indeed, such reasoning equally applies to the *Buono IV* opinion's conclusion that the government retained authority to control Sunrise Rock. The appropriate remedy would be to enjoin such alleged government control, rather than to require the removal of the memorial despite the VFW's private ownership of it.

ment effort to favor a particular religious sect, primarily to promote religion . . . ."); *compare McCreary*, 545 U.S. at 851 (Ten Commandments statues were put in place by government officials in 1999).

While the cross at Sunrise Rock takes the form of an ordinarily religious symbol, it serves the secular purpose of memorializing fallen soldiers.[6] Of course, the monument in *Van Orden* was also an ordinarily religious symbol, but that fact alone was insufficient to constitute a violation of the Establishment Clause. *See Van Orden*, 545 U.S. at 703 (concluding that the monument "serv[ed] a mixed but primarily nonreligious purpose"). Additionally, while the statue in *Van Orden* was placed in a "large park" with other monuments, the lack of *any* challenge to the Sunrise Rock memorial for *seven decades* surely demonstrates that the public understands and accepts its secular commemorative purpose. *See id.* at 701-02; *Card v. City of Everett*, 520 F.3d 1009, 1021 (9th Cir. 2008) (noting that public complaints "did not surface until the monument had been in place for over thirty years").[7]

By altogether ignoring the dispositive considerations in *Van Orden*, the *Buono IV* opinion vitiates the Supreme Court's caution against applying the endorsement test in a

---

[6]Indeed, there are many monuments on public land that use the cross to commemorate the sacrifice of fallen soldiers, particularly those in World War I. To name some examples: the Argonne Cross Memorial and the Canadian Cross of Sacrifice in Arlington National Cemetery; the French Cross Monument in the Cypress Hill National Cemetery; the Peace Cross in Bladensburg, Maryland; the Unknown Soldiers Monument in Prescott National Cemetery; and the Wall of Honor at the Pennsylvania Military Museum. These monuments surely honor soldiers of all creeds, and no reasonable viewer would conclude that they exclude or discount the sacrifice of non-Christians.

[7]*Van Orden* certainly may not be construed as narrowly requiring such a clustering of monuments; Justice Breyer's concurrence explicitly cited other factors in determining that its presence on state land did not violate the Establishment Clause. *See Van Orden*, 545 U.S. at 701-02.

manner that has "radical implications for our public policy."
*Pinette*, 515 U.S. at 768 (1995) (plurality opinion); *see also
Corp. of the Presiding Bishop of the Church of Jesus Christ
of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987)
("There is ample room under the Establishment Clause for
benevolent neutrality which will permit religious exercise to
exist without sponsorship and without interference.") (internal
quotation marks omitted).

V

In addition to discussing the foregoing inter-circuit and pre-
cedential conflicts, I must voice my strong disagreement with
the merits of the *Buono IV* opinion.

A

First, *Buono IV* concludes that "the various statutes"
involved in this case, "when read as a package, evince contin-
uing government control." *Buono IV*, 502 F.3d at 1082. How-
ever, while the NPS Director, under the supervision of the
Secretary of the Interior, is responsible for overall manage-
ment and supervision of the Mojave National Preserve,
including "the supervision, management, and control of
national monuments," 16 U.S.C. § 2, such authority applies
only to *federal* land, *see* 16 U.S.C. § 431 (authority to declare
national monuments expressly limited to objects "situated
upon the lands owned or controlled by the Government of the
United States"); *see also* 16 U.S.C. § 1 ("The service thus
established shall promote and regulate the use of the *Federal*
areas known as national parks, monuments, and reservations
hereinafter specified . . . .") (emphasis added). Additionally,
while § 431 provides that the Secretary of the Interior may
accept relinquishment of privately-owned property to provide
"the proper care and management" of monuments, it does not
authorize government officials forcibly to take private prop-
erty to provide such care or to enter private land.

Section 8121(a), likewise, provides little support for the opinion's conclusion, as it merely requires the Secretary of the Interior to carry out the duties set forth in section 8137. Section 8137 very clearly delineates the limited obligations owed by the Secretary, namely that the Secretary "acquire a replica of the original memorial plaque and cross placed at the national World War I memorial," and "install the plaque in a suitable location on the grounds of the memorial." Simply put, if Congress wanted to retain the broad oversight suggested by the *Buono IV* opinion, it would have said as much, particularly if it was so firmly committed to ensuring that the Sunrise Rock memorial will retain its present form.[8] Indeed, it is telling that the district court came to precisely the same conclusion. *See Buono III*, 364 F. Supp. 2d at 1180 (finding that section 8121 "[gave] the Secretary access to the subject property in the form of an easement or license for a particular purpose," namely, to make a replica of the statue and install a replica of the plaque). I fail to see how such trivial, fleeting duties constitute "intimate involvement" sufficient to strike down section 8121.

B

Second, *Buono IV* faults the government for failing to hold a hearing before transferring the land to the VFW, determining that such conduct constituted the improper "exclusion of other purchasers." 502 F.3d at 1084-85. The opinion cites 16 U.S.C. § 460*l*-22 in support, but that statute is wholly irrelevant, as it solely concerns land transfers initiated by the Secretary of Interior, whereas the land exchange in question here was directly authorized by Congress. *See Id*. Contrary to the

---

[8]Likewise, as noted, the reversionary clause in section 8121 cannot constitute state action absent an attempt by the government to exercise it. *See Marshfield*, 203 F.3d at 491-93 (holding that a covenant requiring that the transferred land be used as a public park "will not affect the validity of the transfer" because "[t]he plaintiffs do not contend that the City has made any effort to enforce this restrictive covenant").

suggestion in *Buono IV*, under § 460*l*-22(b), the Secretary is required to hold an open bidding process *only* "[u]pon request of a State or a political subdivision thereof, or of a party in interest, prior to such exchange." There is no indication in the record that any such party requested a hearing in this case. Thus, even if Congress is somehow bound by subordinate administrative rules, the transfer of Sunrise Rock was perfectly appropriate under the plain language of § 460*l*-22(b).[9]

In any event, the *Buono IV* opinion comes to the perplexing conclusion that Congress's failure to comply with "agency procedures" binding solely the Secretary of Interior demonstrates that *Congress* acted inappropriately in its failing to hold an open bidding process. *Buono IV*, 502 F.3d at 1085. I am unaware of any precedent suggesting that *congressional* action is in any way suspect where it fails to adhere to an *agency*'s procedural rules. I also am unaware of any precedent disparaging a land transfer for having been enacted in an appropriations bill, nor does the *Buono IV* opinion cite to *any* caselaw in support of such consideration. 502 F.3d at 1084.[10]

---

[9]Even assuming that 16 U.S.C. § 460*l*-22 is relevant to its decision, *Buono IV* errs in discussing § 460*l*-22(a). As the district court found and the parties expressly conceded on appeal, the land exchange in this case would have been governed solely by § 460*l*-22(b) had it been authorized by the Secretary of the Interior rather than mandated by Congress. *See Buono III*, 364 F. Supp. 2d at 1181.

[10]Moreover, here again the opinion shrugs off the conflicting holdings in *Marshfield* and *Mercier*, which "upheld the sale of property to a private party without an open market bidding process." *Buono IV*, 502 F.3d at 1084-85; *see also Marshfield*, 203 F.3d at 492-93; *Mercier*, 395 F.3d at 702-03. Indeed, as in those cases, the Sunrise Rock memorial was transferred to the most "logical purchaser," namely the organization that constructed the memorial in the first place. *Buono IV*, 502 F.3d at 1084-85. The panel fails to provide any reason for diverging from the Seventh Circuit's holdings, short of discussing the purported conflict with "normal agency procedures."

## C

Third, the opinion points to "the government's long-standing efforts to preserve and maintain the cross atop Sunrise Rock" as supporting the conclusion "that the government's purpose in this case is to evade the injunction and keep the cross in place." *Buono IV*, 502 F.3d at 1085. Whether the government sought to evade the injunction in the past is collateral to the issue before us; the only relevant issue is whether the transfer rendered the injunction moot by divestment of Sunrise Rock to a private party. *See Paulson v. City of San Diego*, 475 F.3d 1047, 1048 (9th Cir. 2007) (holding that an injunction prohibiting, under the California Constitution, the continued existence of a cross on municipal property was rendered moot when the municipality transferred the land to the federal government, which is not bound by state law); *cf. Staley v. Harris County*, 485 F.3d 305, 308-09 (5th Cir. 2007) (en banc) (holding that an injunction ordering the removal of a religious monument was mooted by the municipality's decision to temporarily remove the statue). Of course, the government may moot an injunction by *curing* the violation that spurred it; *Paulson*, as well as common sense, compel no less. Accordingly, *Buono IV* faults the government for engaging in conduct that was perfectly permissible. I fail to see why the government's past, unsuccessful efforts to cure the Establishment Clause violation should foreclose it from pursuing further *legitimate* efforts.

In any event, given our opinion in *Buono II*, it is easy to understand why the government would conclude that carrying out the land transfer was an appropriate response: we based our holding that the Sunrise Rock cross violated the Establishment Clause on its having been situated on "publicly-owned land," and we expressly refused to address the constitutionality of a land transfer under section 8121. *Buono II*, 371 F.3d at 548-49. Accordingly, the government reasonably concluded that we *condoned* the land transfer, notwithstanding a subsequent decision on the constitutionality of section 8121; to

fault the government for carrying out section 8121 is nothing short of a judicial "bait-and-switch." If anything, transferring the land was the obvious next step in attempting to cure the violation while ensuring the continued presence of a 74-year-old war memorial. *See Mercier*, 395 F.3d at 705 ("The City is able to extricate itself completely from the implied endorsement of the purpose and content of the religious symbol, yet the Monument can remain in the location it has occupied for many years.").

## VI

The *Buono IV* opinion contravenes binding Supreme Court precedent, creates a split from the Seventh Circuit on multiple issues, invests judges with the dangerous and unprecedented authority to infringe upon fundamental private rights, and rests on patently flawed reasoning. I sympathize with my colleagues' frustration that a court can lose control of its injunction by the enjoined party's unanticipated abdication of ownership, thus mooting the case. But such risk is inherent in our trade, and for good reason.

I therefore respectfully dissent from our unfortunate decision not to rehear this case *en banc*.

---

## OPINION

McKEOWN, Circuit Judge:

A Latin cross sits atop a prominent rock outcropping known as "Sunrise Rock" in the Mojave National Preserve ("Preserve"). Our court previously held that the presence of the cross in the Preserve—which consists of more than 90 percent federally-owned land, including the land where the cross is situated—violates the Establishment Clause of the United States Constitution. *Buono v. Norton*, 371 F.3d 543

(9th Cir. 2004). We affirmed the district court's judgment permanently enjoining the government "from permitting the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve."

During the pendency of the first appeal, Congress enacted a statute directing that the land on which the cross is situated be transferred to a private organization in exchange for a parcel of privately-owned land located elsewhere in the Preserve. *See* Pub.L. No. 108-87, R. 12.1, 12.4 § 8121(a)-(f), 117 Stat. 1100 (2003). That land exchange is already in progress and would leave a little donut hole of land with a cross in the midst of a vast federal preserve. The issue we address today is whether the land exchange violates the district court's permanent injunction. We conclude that it does, and affirm the district court's order permanently enjoining the government from effectuating the land exchange and ordering the government to comply with the original injunction.

## BACKGROUND[1]

### I. THE MOJAVE NATIONAL PRESERVE

The Preserve encompasses approximately 1.6 million acres, or 2,500 square miles, of primarily federally-owned land in the Mojave Desert, located in Southeastern California. In 1994, the Bureau of Land Management ("BLM") transferred the land to the National Park Service ("NPS"); both the BLM and the NPS are federal agencies under the Department of the Interior ("DOI"). Within the Preserve, approximately 86,000 acres of land are privately owned and 43,000 acres belong to the State of California. Thus, slightly more than 90 percent of the land in the Preserve is federally owned. The Preserve is

---

[1]Further background detail is found in the district court's order and our prior opinion on the merits of the Establishment Clause challenge. *See generally Buono v. Norton*, 212 F. Supp. 2d 1202 (C.D. Cal. 2002) ("*Buono I*"); *Buono*, 371 F.3d 543 (9th Cir. 2004) ("*Buono II*").

a "unit of the National Park System" and is given "statutory protection as a national preserve." 16 U.S.C. § 410*aaa*-41, 410*aaa*-42; *id.* § 1(c). The Preserve is under NPS jurisdiction and authority. *Id.* § 410*aaa*-46.

## II.   THE CROSS

The current incarnation of the cross atop Sunrise Rock is between five and eight feet tall and is constructed out of four-inch diameter metal pipes painted white. It is a Latin cross, meaning that it has two arms, one horizontal and one vertical, at right angles to one another. It is undisputed that "[t]he Latin cross is the preeminent symbol of Christianity. It is exclusively a Christian symbol, and not a symbol of any other religion." *Buono I*, 212 F. Supp. 2d at 1205.

Historic records reflect that a wooden cross was built on that location as early as 1934 by the Veterans of Foreign Wars ("VFW") as a memorial to veterans who died in World War I. Photographs depict the wooden cross and signs near it stating: "The Cross, Erected in Memory of the Dead of All Wars," and "Erected 1934 by Members of Veterans of Foregin [sic] Wars, Death Valley post 2884." The wooden signs are no longer present, and the original wooden cross, which is no longer standing, has been replaced by private parties several times since 1934. The cross has been an intermittent gathering place for Easter religious services since as early as 1935, and regularly since 1984.

The current version of the cross was built by Henry Sandoz, a local resident, sometime in 1998. When NPS investigated the history of the cross, Sandoz explained that he drilled holes into Sunrise Rock to bolt the cross in place, making it difficult to remove. Sandoz did not receive a permit from NPS to construct the cross.

Following *Buono I*'s injunction against display of the cross, the cross has been covered by a plywood box. When uncov-

ered, the cross is visible from vehicles traveling on Cima Road, which passes through the Preserve, from a distance of approximately 100 yards away. No sign indicates that the cross was or is intended to act as a memorial for war veterans.

## III. LITIGATION OVER THE CROSS AND THE CONGRESSIONAL RESPONSE

The current controversy surrounding the cross surfaced in 1999, when NPS received a request from an individual seeking to build a "stupa" (a dome-shaped Buddhist shrine) on a rock outcropping at a trailhead located near the cross. NPS denied that request, citing 36 C.F.R. § 2.62(a)[2] as prohibiting the installation of a memorial without authorization. A handwritten note on the denial letter warns that "[a]ny attempt to erect a stupa will be in violation of Federal Law and subject you to citation and/or arrest." The letter also indicates that "[c]urrently there is a cross on [a] rock outcrop located on National Park Service lands. . . . It is our intention to have the cross removed."

In 1999, NPS undertook a study of the history of the cross. NPS determined that neither the cross nor the property on which it is situated qualifies for inclusion in the National Register of Historic Places. Specifically, NPS recognized that the cross itself "has been replaced many times and the plaque that once accompanied it (even though it is not known if it is original) has been removed." Also, the property does not qualify as an historical site because, among other things, "the site is used for religious purposes as well as commemoration."

Following the announcement by NPS of its intention to remove the cross, the United States Congress passed a series

---

[2]The regulation provides that: "The installation of a monument, memorial, tablet, structure, or other commemorative installation in a park area without the authorization of the Director is prohibited." 36 C.F.R. § 2.62(a).

of laws, described below, to preserve the Sunrise Rock cross. The first piece of legislation, enacted in December 2000, provided that no government funds could be used to remove the cross. *See* Pub. L. No. 106-554 § 133, 114 Stat. 2763A-230 (2000) (hereafter "§ 133").[3]

## A. *Buono I*

Frank Buono[4] filed suit in March 2001 against the Secretary of the DOI, the Regional Director of NPS, and the Superintendent of the Preserve (collectively, "NPS" or "Defendants"). The district court concluded that the presence of the cross in the Preserve violates the Establishment Clause. *See Buono I*, 212 F. Supp. 2d at 1215-17. In July 2002, the court entered a permanent injunction ordering that the "Defendants, their employees, agents, and those in active concert with Defendants, are hereby permanently restrained and enjoined from permitting display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve."[5]

---

[3]"None of the funds in this or any other Act may be used by the Secretary of the Interior to remove *the five-foot-tall white cross* located within the boundary of the Mojave National Preserve in southern California first erected in 1934 by the Veterans of Foreign Wars along Cima Road approximately 11 miles south of Interstate 15." § 113 (emphasis added).

[4]Buono is a retired NPS employee who worked for the agency from 1972 to 1997. From September 1994 to December 1995, Buono worked as the Assistant Superintendent of the Preserve.

[5]We granted the government's motion to stay the injunction pending appeal, insofar as the injunction required NPS to immediately remove or dismantle the cross. The stay did not apply to any "alternative methods" for complying with, or additional obligations imposed by, the district court's order. *See Buono II*, 371 F.3d at 545 n.1 (discussing stay orders). During the appeal, NPS covered the cross, first with a large tarpaulin and later with a plywood box, which the government asserts will remain in place pending resolution of this action.

**B. Designation of the Cross as a National Memorial**

In January 2002, while this matter was pending in district court, Congress passed a defense appropriations bill, which included a section designating the Sunrise Rock cross as a "national memorial." *See* Pub.L. No. 107-117 § 8137, 115 Stat. 2278-79 (2002), *codified at* 16 U.S.C. § 410*aaa*-56 (note) (hereafter "§ 8137"). That section provides:

(a) DESIGNATION OF NATIONAL MEMORIAL. —*The five-foot-tall white cross* first erected by the Veterans of Foreign Wars of the United States in 1934 along Cima Road in San Bernardino County, California, and now located within the boundary of the Mojave National Preserve, as well as a limited amount of adjoining Preserve property to be designated by the Secretary of the Interior, *is hereby designated as a national memorial commemorating United States participation in World War I and honoring the American veterans of that war.*

(b) LEGAL DESCRIPTION.—The memorial cross referred to in subsection (a) is located at latitude 35.316 North and longitude 115.548 West. The exact acreage and legal description of the property to be included by the Secretary of the Interior in the national World War I memorial shall be determined by a survey prepared by the Secretary.

(c) REINSTALLATION OF MEMORIAL PLAQUE.—The Secretary of the Interior shall use not more than *$10,000 of funds* available for the administration of the Mojave National Preserve to *acquire a replica of the original memorial plaque and cross placed at the national World War I memorial* designated by subsection (a) and to install the plaque in a suitable location on the grounds of the memorial.

*Id.* (emphases added). The cross is designated the "White Cross World War I Memorial." 16 U.S.C. § 431 (note).

NPS is statutorily charged with "the supervision, management, and control of the several national parks and national monuments." 16 U.S.C. § 2. National "memorials" fall within the broader category of national "monuments." *See* U.S.C. § 431 (note) (identifying recognized national monuments, including various categories of "national monuments" and "national memorials").

In October 2002, less than three months after the district court's injunction, in legislation aimed at the Sunrise Rock cross, Congress passed a defense appropriations bill that included a provision barring the use of federal funds "to dismantle national memorials commemorating United States participation in World War I." Pub. L. No. 107-248 § 8065(b), 116 Stat.1551 (2002) (hereafter "§ 8065").

## C.  *BUONO II* AND PASSAGE OF § 8121

The government appealed the district court's order and injunction. In September 2003, one month after oral argument before a panel of our court but before a decision issued, Congress enacted another defense appropriations bill that included a land exchange agreement regarding the Sunrise Rock cross. *See* Pub. L. No. 108-87 § 8121(a)-(f), 117 Stat. 1100 (2003), *codified at* 16 U.S.C. § 410*aaa*-56 (note), (hereafter "§ 8121"). The statute provides:

> (a) EXCHANGE REQUIRED.— *In exchange for the private property described in subsection (b)*, the Secretary of the Interior *shall convey* to the Veterans Home of California— Barstow, Veterans of Foreign Wars Post #385E (in this section referred to as the "recipient"), all right, title, and interest of the United States in and to *a parcel of real property consisting of approximately one acre in the Mojave National*

*Preserve and designated* (by section 8137 of the Department of Defense Appropriations Act, 2002 (Public Law 107-117; 115 Stat. 2278)) *as a national memorial commemorating United States participation in World War I and honoring the American veterans of that war.* Notwithstanding the conveyance of the property under this subsection, *the Secretary shall continue to carry out the responsibilities of the Secretary under such section 8137.*

(b) CONSIDERATION.—As consideration for the property to be conveyed by the Secretary under subsection (a), Mr. and Mrs. Henry Sandoz of Mountain Pass, California, have agreed to convey to the Secretary a parcel of real property consisting of approximately five acres, identified as parcel APN 569-051-44, and located in the west 1/2 of the northeast 1/4 of the northwest 1/4 of the northwest 1/4 of section 11, township 14 north, range 15 east, San Bernardino base and meridian.

§ 8121(a)-(b) (emphases added). The government retains a reversionary interest in the property as follows:

(e) REVERSIONARY CLAUSE. — The conveyance under subsection (a) shall be subject to the condition that the recipient maintain the conveyed property as a memorial commemorating United States participation in World War I and honoring the American veterans of that war. *If the Secretary determines that the conveyed property is no longer being maintained as a war memorial, the property shall revert to the ownership of the United States.*

§ 8121(e) (emphasis added). The cross-reference in § 8121(a) to § 8137 pertains to use of federal funds to acquire a replica cross and plaque. *See* § 8197(c). The land transfer was under-

way when the district court enjoined its enforcement, as described below.

In June 2004, in affirming the district court's permanent injunction, we held that the presence of the cross in the Preserve violates the Establishment Clause, agreeing with the district court that this case is "squarely controlled" by *Separation of Church and State Committee v. City of Eugene*, 93 F.3d 617 (9th Cir. 1996) ("*SCSC*"). *Buono II*, 371 F.3d at 548. In *SCSC*, we reasoned that the presence of a cross on city land, even where it bore a plaque dedicating the cross as a war memorial to veterans, 93 F.3d at 618, violated the Establishment Clause because "the presence of the cross may reasonably be perceived as governmental endorsement of Christianity." *Id.* at 620.

The government's several attempts to distinguish *SCSC* were not persuasive. For example, we held that it was "of no moment" that the cross in *SCSC* was significantly taller, located in an urban area, or illuminated during certain holidays:

> Though not illuminated, the cross here is bolted to a rock outcropping rising fifteen to twenty feet above grade and is visible to vehicles on the adjacent road from a hundred yards away. Even if the shorter height of the Sunrise Rock cross means that it is visible to fewer people than was the *SCSC* cross, this makes it no less likely that the Sunrise Rock cross will project a message of government endorsement. . . . Nor does the remote location of Sunrise Rock make a difference. That the Sunrise Rock cross is not near a government building is insignificant — neither was the *SCSC* cross. What is significant is that the Sunrise Rock cross, like the *SCSC* cross, sits on public park land. *National parklands and preserves embody the notion of government ownership as much as urban parkland, and the remote location of*

> *Sunrise Rock does nothing to detract from that notion.*

*Buono II*, 371 F.3d at 549-50 (emphasis added).

We also held that a reasonable observer, even without knowing whether Sunrise Rock is federally owned, *would believe—or at least suspect*—that the cross rests on public land because of the vast size of the Preserve, more than 90 percent of which *is* federally owned. *Id.* at 550 (citing reasonable observer test set forth in *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780-81 (1995) (O'Connor, J., concurring)). A reasonably informed observer aware of the history of the Sunrise Rock cross would know not only that the cross was erected by private individuals (which the government argued favored its view), but also that Congress has taken various measures to preserve the cross, i.e., designating it a war memorial, prohibiting use of federal funds to remove it, and denying similar access for a Buddhist shrine. *Id.*

Acknowledging the passage of § 8121 while the appeal was pending, we addressed the government's challenge that § 8121 rendered the appeal moot or would soon do so. We rejected the government's mootness challenge for two reasons: First, we held that the case was not moot because the land transfer had not yet taken effect. *Id.* at 545. Second, because "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case," we held that *even if* the land transfer had taken effect, the government still had not carried its heavy burden to show mootness. *Id.* at 546. Even if the land were transferred under § 8121(a), it *may revert* to the government under § 8121(e), or as provided in other statutes. In particular, we noted that 16 U.S.C. § 431 authorizes relinquishment of lands containing "national monuments" to the federal government, and 16 U.S.C. § 410*aaa*-56 authorizes the Department of the Interior to "acquire all lands and interest in lands within the boundary of the [Mojave] preserve

by donation, purchase, or exchange." *Id.* at 546 (discussing § 8121, 16 U.S.C. §§ 431, 410*aaa*-56).

## D.  *BUONO III*

Despite the injunction against display of the cross in the Preserve, the government began moving forward with the mechanics of the land exchange under § 8121. Buono then moved to enforce the district court's prior injunction, or modify it to prohibit the land exchange as a violation of the Establishment Clause. In April 2005, the district court granted Buono's motion to enforce the injunction, and denied as moot the request to amend the permanent injunction. *See Buono v. Norton*, 364 F. Supp. 2d 1175, 1177, 1182 & n.8 (C.D. Cal. 2005) ("*Buono III*").   According to the district court, "the transfer of the Preserve land containing the Latin Cross which as [a] sectarian war memorial carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion is an attempt by the government to evade the permanent injunction enjoining the display of the Latin Cross atop Sunrise Rock." *Id.* at 1182 (citation and quotation marks omitted). The district court deemed the exchange "invalid" and permanently enjoined the government "from implementing the provisions of Section 8121 of Public Law 108-87" and ordered the government "to comply forthwith with the judgment and permanent injunction entered by th[e] court on July 24, 2002." *Id.* It is that decision that the government now appeals.

## STANDARD OF REVIEW

We review for abuse of discretion the district court's order enforcing its prior injunction. *Paulson v. City of San Diego*, 294 F.3d 1124, 1128 (9th Cir. 2002). A district court abuses its discretion in this regard if "it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id.*

## ANALYSIS

In the district court, Buono advanced two alternative arguments challenging the land exchange under § 8121. First, Buono argued that the land exchange is an attempt to evade the permanent injunction. Alternatively, he argued that the land exchange itself violates the Establishment Clause because it is an improper governmental endorsement of religion. The district court's holding is grounded only on the first basis, i.e., that the land exchange is a sham transaction with the purpose of permitting continued display of the cross in violation of the permanent injunction. On appeal, the government contends that § 8121 was a bona fide attempt by Congress to comply with the injunction. The government also argues that because it was not given the opportunity to fully effectuate the transfer, there are unknown facts that render this controversy "unripe" for judicial review.

Turning first to the government's ripeness challenge, we conclude that this controversy is ripe for review. As to the second question, the district court did not abuse its discretion in enforcing the injunction. We agree that the exchange effectuated by § 8121 violates the injunction, which prohibits the display of the Latin cross because it runs afoul of the Establishment Clause.

## I.   RIPENESS

Ripeness is a justiciability requirement that seeks to avoid premature litigation of disputes. *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 579-81 (1985) ("[R]ipeness is peculiarly a question of timing.") (citations omitted). The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993); *accord Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138-42 (9th Cir. 2000) (en banc) (discussing constitutional and prudential components of

ripeness). The ripeness question we address is whether it is premature to consider a violation of the injunction before completion of the land exchange.

## A.   Constitutional Component of Ripeness

The constitutional component of ripeness—that there be an Article III "case or controversy"—requires a concrete impact upon the parties arising from the dispute. *Union Carbide*, 473 U.S. at 579. This analysis is similar to the injury-in-fact inquiry under the standing doctrine. *See Anchorage Equal Rights Comm'n*, 220 F.3d at 1138-39.

The government argues that before litigation proceeds, it should be given an opportunity to try to execute the land exchange in compliance with the prior injunction and the government's constitutional obligations. Buono responds that the "concrete" injury ripe for review is that the land transaction's very structure evidences its lack of a secular purpose and its effect continues the government's improper endorsement of religion that we already held exists.

This case can best be described as an ongoing controversy about the cross, the specifics of which shift with successive congressional enactments. The controversy is neither premature nor will it go away on its own. Given the specifics of § 8121, it is no answer to say that the land exchange is not complete. It is, as the district court notes, "already in progress," and the government intends to complete it. *Buono III*, 364 F. Supp. 2d at 1178. Buono's challenge to the present terms of the exchange is not a "hypothetical request[ ] for an advisory opinion." *Anchorage Equal Rights Comm'n*, 220 F.3d at 1141.

**[1]** The Supreme Court has held that pre-enforcement review of a statute is appropriate where the governmental purpose in enacting the statute evidences an improper endorsement of religion in violation of the Establishment Clause. *See*

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 313-14 (2000). It is no legal leap to conclude that pre-enforcement review is similarly appropriate where the purpose of a statute is to evade an injunction intended to end an ongoing Establishment Clause violation.

In *Santa Fe*, the Supreme Court considered the ripeness of a facial challenge to a school district's policy purportedly allowing school prayer. *Id.* The policy permitted students (a) to vote on whether there should be a student-delivered invocation given at the start of high school football games, and (b) to later vote to select the one student who would deliver the invocation at all games throughout the year. *Id.* at 297-98. The school district argued that it was premature to review the policy because there "can be no certainty that any of the statements or invocations will be religious." *Id.* at 313. Rejecting that challenge, the Court concluded that while forcing a student "to participate in religious worship" was a serious constitutional injury, so too was the "mere passage by [the school district] of a policy that has the purpose and perception of government establishment of religion. . . . [and] the implementation of a governmental electoral process that subjects the issue of prayer to a majoritarian vote." *Id.* at 313-14 (recognizing that "the Constitution also requires that we keep in mind 'the myriad, subtle ways in which Establishment Clause values can be eroded.' ") (quoting *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring)). Thus, the mere enactment of the policy, particularly in light of the school district's conduct, was a sufficient constitutional injury to warrant pre-enforcement review, and ultimately an injunction against implementation of the policy. *Id.* at 316.**[6]** Impor-

---

**[6]**Our cases have similarly held that passage of a statute and putting it into effect (even if the effect is not complete) gives rise to a dispute ripe for judicial review. In *Saint Elizabeth Community Hospital v. NLRB*, 708 F.2d 1436 (9th Cir. 1983), a church-run hospital challenged the National Labor Relations Board's jurisdiction over it as a violation of the Establishment Clause. *Id.* at 1440. Congress had amended the National Labor Rela-

tantly, in analyzing ripeness, the Court looked to the history of the school district's conduct in enacting the policy and the true purpose of the policy. *Id.* at 314-15.

**[2]** The analogy to *Santa Fe* is apt. Here, both the district court and this court have concluded that a grave constitutional injury *already exists.* The permitting display of the Sunrise Rock cross in the Preserve is an impermissible governmental endorsement of religion. *See Buono II*, 371 F.3d at 548-50. As discussed further below, the constitutional injury will persist after—and as a result of—the land exchange effectuated under § 8121. This is so because (among other things) § 8121 and other applicable statutes[7] permit the government's significant *ongoing control* of and involvement with the cross and the property on which it is situated. *See Santa Fe*, 530 U.S. at 314-15 (concluding that the text of the school district's policy alone reveals the extent of school involvement in the election of the student speaker and the content of the message to be delivered). And, the government's repeated actions in preserving the cross (and forestalling enforcement of the injunction) further evidence its goal of keeping the cross in place, *see* §§ 133, 8137, 8056(b), 8121, just as the school district in *Santa Fe* acted with the purpose of maintaining a school policy permitting prayer at school events. *Santa Fe*, 503 U.S. at 314-15.[8]

---

tions Act expressly conferring jurisdiction over nonprofit hospitals without excepting those run by religious institutions. We concluded that the question of NLRB's jurisdiction was ripe for review. *Id.* In *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Board of Oil & Gas Conservation of the State of Montana*, 792 F.2d 782 (9th Cir. 1986), we held that the claim of Indian tribes challenging the validity of a cooperative agreement regarding agency jurisdiction to advise the tribes about oil and gas rights was sufficiently ripe where the final cooperative agreement had been placed into operation by the agreeing agencies. *Id.* at 788-89.

[7]*See* § 8137(a)-(c), 16 U.S.C. §§ 431, 410*aaa*-56.

[8]The various governmental actions are discussed in further detail *infra* § II.A.3.

**[3]** Buono has alleged a sufficient constitutional injury to overcome any argument that his challenge to § 8121 is unripe. *See Santa Fe*, 530 U.S. at 314-15. The challenge in this case presents a concrete injury, rather than an "imaginary" or "speculative" one.[9]

## B. PRUDENTIAL COMPONENT OF RIPENESS

**[4]** Even where a concrete case or controversy is present, we consider whether, because of prudential concerns, we should decline to exercise jurisdiction. *See Union Carbide*, 473 U.S. at 581; *Anchorage Equal Rights Comm'n*, 220 F.3d at 1141. We evaluate two interrelated factors: (a) the hardship that the party seeking relief will suffer from withholding judicial action, and (b) the fitness of the issues in the record for judicial review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

**[5]** This case easily satisfies both prudential components. As to the harm, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Union Carbide*,

---

[9]The government can hardly rely, as a predicate for a ripeness challenge, on its attempt to temporarily comply with the permanent injunction by covering the cross with a wooden box. If that were the final compliance mechanism, the district court could determine whether it is sufficient. Significantly, however, the government is proceeding with the land exchange. *See Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 127 S.Ct. 2738, 2751 (2007) (holding that school district's voluntary cessation of use of racial tiebreaker pending outcome of litigation did not negate Article III standing of plaintiff group members challenging policy, as the school continued to vigorously defend the policy in court); *Friends of Earth, Inc. v. Laidlaw Envt'l Svcs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (holding that voluntary cessation of wrongful conduct, either by defendant's achievement of substantial compliance with its permit requirements or its shutdown of offending facility, did not moot controversy over defendant's compliance with Clean Water Act because the offending conduct had not permanently ceased).

473 U.S. at 581 (internal quotations and citations omitted).[10] The hardship resulting from the continuation of an Establishment Clause violation enjoined by the court is sufficient.

A claim is "fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Exxon Corp. v. Heinze*, 32 F.3d 1399, 1404 (9th Cir. 1994) (citations omitted). These requirements are satisfied here.

The key issue is primarily a question of law, i.e., whether the land exchange under § 8121 violates the district court's order permanently enjoining the government from permitting display of the cross in the Preserve. *See, e.g.*, *Santa Fe*, 530 U.S. at 314 (permitting facial challenge to school district's policy prior to enforcement of the policy based largely on the Court's ability to construe the constitutionality of the policy's purpose as a legal matter); *Union Carbide*, 473 U.S. at 581 (granting pre-enforcement review of constitutionality of administrative scheme requiring registrants to participate in binding arbitration of disputes with limited judicial review because party's challenge raised solely legal issues).

Next, we assess the state of the factual record, an inquiry that overlaps with (and in this case collapses into) the third component, the finality of the decision. *Friedman Bros. Inv. Co. v. Lewis*, 676 F.2d 1317, 1319 (9th Cir. 1982). The government argues that the record is incomplete because certain factual scenarios, as yet unknown, could occur at some time in the future. The government illustrates its claim by positing two potential scenarios that may occur rendering decision on

---

[10]Unlike in *Anchorage Equal Right Comm'n*, where the plaintiffs sought review of a housing law "in a vacuum and in the absence of any particular victims of discrimination," 220 F.3d at 1142, in this case there is a concrete victim—Buono—and the statutes are not being analyzed in a vacuum. *See, e.g.*, *Buono III*, 364 F. Supp. 2d at 1181-82 (discussing history of government's preservation efforts regarding the cross).

this appeal premature. Upon examination, neither proposed scenario persuades us that we should delay decision in this matter.

First, the government argues that once the land exchange is complete the VFW *might* at some point in the future *remove* the cross, but continue to maintain the property as a "war memorial" as provided under § 8121. Thus, according to the government, the court should not decide whether the injunction is violated unless and until the land exchange is complete and the VFW has an opportunity to decide whether to maintain or remove the cross.

Under the government's construction, the dispute would never be ripe because, even if the transfer occurred, the government or the VFW could always argue that removal of the cross could occur at some point in the future. Such gamesmanship is not sanctioned by our prudential ripeness doctrine.

The government's view is also at odds with two statutes related to the Sunrise Rock cross, which, when read together, demonstrate that the VFW cannot remove the cross without forfeiting the property to the government. Section 8137(a) designates "*the five-foot-tall white cross*" . . . as a "national memorial." § 8137(a) (emphasis added); *see also* § 8137(b) (referring to "[t]he memorial cross"); 16 U.S.C. § 431 (note) (listing "national memorial" titled "White Cross World War I Memorial"). In other words, the cross itself is the memorial. Section 8121(e) conditions transfer of the land on the VFW's agreement to "maintain the conveyed property as a memorial commemorating United States participation in World War I and honoring the American veterans of that war." § 8121(e). Section 8121(e) further provides that if "the conveyed property is no longer being maintained as a war memorial, the property *shall revert* to the ownership of the United States." *Id.* (emphasis added). Under these two statutes, the VFW's removal of the cross from Sunrise Rock would trigger the reversionary clause of § 8121(e) and the land would revert to

the United States. Nothing permits the VFW to destroy a national memorial, remove the cross, and erect a substitute memorial. The entire scheme is directed to preservation of the cross.

To suggest that we do not yet know enough facts to decide this dispute ignores the practical reality of these statutory mandates. In *Santa Fe*, the Court rejected the school district's similarly implausible explanations for its conduct, based on the history and context of the school district's actions:

> The District, nevertheless, asks us to pretend that we do not recognize what every Santa Fe High School student understands clearly — that this policy is about prayer. The District further asks us to accept what is obviously untrue: that these messages are necessary to "solemnize" a football game and that this single-student, year-long position is essential to the protection of student speech. *We refuse to turn a blind eye to the context in which this policy arose*, and that context quells any doubt that this policy was implemented with the purpose of endorsing school prayer.

*Santa Fe*, 530 U.S. at 315 (emphasis added).

The government also argues that DOI might never exercise the reversionary clause, even if the cross is removed. Again, this argument fails as § 8121(e) itself provides that the property "shall revert" if the property is no longer maintained as a "war memorial," i.e., *the cross* under § 8137. Countenancing this argument would also render the claim perpetually unripe, bringing to mind the Rule Against Perpetuities. Although the rule surely does not apply in this context, common sense should.

**[6]** Even though the transfer itself is not complete, the certainty of the governmental action taking place is sufficiently

ripe to allow review. *See, e.g.*, *Friedman*, 676 F.2d at 1318-19 (concluding that challenge to agency's action as violating National Environmental Policy Act was ripe where agency had granted funds for project and exempted it from certain of NEPA's requirements, despite that formal action to acquire the subject property by condemnation had not yet commenced). Thus, none of the prudential ripeness concerns weigh against our rendering a decision.[11]

## II. Violation of the Permanent Injunction

We next address whether the district court abused its discretion in concluding that "transfer of the Preserve land containing the Latin Cross, which 'as [a] sectarian war memorial carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion' . . . is an attempt by the government to evade the permanent injunction enjoining the display of the Latin Cross atop Sunset Rock." *Buono III*, 364 F. Supp. 2d at 1182 (citation omitted).

---

[11]The government raises, for the first time on appeal, a second challenge under the guise of "ripeness." It argues that the district court exceeded its power by issuing a second injunction in the face the government's effort to comply with the original injunction. This is not a true ripeness consideration, but a challenge to the propriety of the district court's exercise of its equitable power to enforce its prior injunction. Because this issue is not one of justiciability or jurisdiction, the government waived the argument by failing to challenge the scope of the district court's action before that court. *See, e.g.*, *Ritchie v. United States*, 451 F.3d 1019, 1026 & n.12 (9th Cir. 2006) (concluding that failure to raise an issue before district court resulted in waiver on appeal, particularly where the issue involved district court's broad discretion and district court "might have been able to address the problem" if raised). Even assuming no waiver, the district court acted within its broad equitable powers to enforce its prior injunction. *See, e.g.*, *Ellis v. City of La Mesa*, 990 F.2d 1518, 1530-31 (9th Cir. 1993) (per curiam) (noting, in dispute over religious symbols on public land, that in light of changed circumstances of ownership of land (or a planned change in ownership), district court has broad equitable powers "to modify, fashion or enforce appropriate equitable relief" in assessing compliance with its prior injunction).

## A.   GOVERNMENT ACTION

In *Buono II*, we noted that "the presence of a religious symbol on once-public land that has been transferred into private hands may still violate the Establishment Clause." *Buono II*, 371 F.3d at 546 (citing *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 496 (7th Cir. 2000)).[12] But we left for another day the question of "whether a transfer completed under section 8121 would pass constitutional muster." *Id.* In considering that question, we examine both the form and substance of the transaction to determine whether the government action endorsing religion has actually ceased. *See Marshfield*, 203 F.3d at 491.[13]

---

[12]In *Marshfield*, it was undisputed that a white, marble, fifteen-foot statue of Jesus Christ situated on city park land violated the Establishment Clause. *Id.* at 489. To remedy the violation, the city sold the statue and a small parcel of land (0.15 acres) beneath the statue to a private organization that agreed to maintain the land and the statue, including paying for the electrical service used to light the statue. *Id.* at 490. After concluding that the sale properly ended the government action with respect to the statue and the property, the court determined that the statue's presence still violated the Establishment Clause. *Id.* at 495. Based on the historic association of the land with the public park, the dedication of the land to use as a public park through a restrictive covenant, and the physical location and visual perception of the now-private property within the public park, the court concluded that a reasonable observer would perceive that the statue was on city park property and that it "constitute[d] a City endorsement of religion." *Id.* at 495-96.

[13]The Seventh Circuit stated that "[a]bsent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion. We are aware, however, that adherence to a formalistic standard invites manipulation. To avoid such manipulation, we look to the substance of the transaction as well as its form to determine whether government action endorsing religion has actually ceased." *Marshfield*, 203 F.3d at 491. Read as a whole, the Seventh Circuit position looks at the issue on a transaction-by-transaction basis. We agree with this approach. However, to the extent that *Marshfield* can be read to adopt a presumption of the effectiveness of a land sale to end a constitutional violation, we decline to adopt such a presumption. The Supreme Court's Establishment Clause jurisprudence recognizes the need to conduct a fact-

As did the district court, based on the circumstances of this case, we consider three aspects of the land exchange under § 8121: (1) the government's continuing oversight and rights in the site containing the cross after the proposed land exchange; (2) the method for effectuating the land exchange; and (3) the history of the government's efforts to preserve the cross.

### 1.  Continuing Government Oversight and Control Over the Cross and Preserve Property

[7] Although Congress sought to transfer the property to the VFW, a private entity, the various statutes, when read as a package, evince continuing government control. The following summary highlights that control:

- NPS retains overall management and supervision of the Preserve.

- NPS is responsible for "the supervision, management, and control" of national memorials.

---

specific inquiry in this area. *Compare McCreary County v. American Civil Liberties Union of Kentucky*, 545 U.S. 844, 884-85 (2005) (holding unconstitutional postings of Ten Commandments at county courthouses on the basis that counties' purpose in erecting displays demonstrated impermissible governmental endorsement of religion), *with Van Orden v. Perry*, 545 U.S. 677, 700 (2005) (upholding "passive monument" inscribed with Ten Commandments on Texas State Capitol grounds based on analysis of monument's and nation's history) (Rehnquist, C.J.) (plurality opinion). *See also Van Orden*, 545 U.S. at 685 nn. 4 & 5 (citing cases under the Establishment Clause over the preceding 25 years of Supreme Court jurisprudence). Moreover, the "public function" cases discussed in *Marshfield* suggest that constitutional violations are not presumptively cured when control is transferred from public to private hands. *Evans v. Newton*, 382 U.S. 296, 301 (1966) ("[W]here the tradition of municipal control had become firmly established, we cannot take judicial notice that the mere substitution of trustees instantly transferred this park from the public to the private sector."); *Terry v. Adams*, 345 U.S. 461, 469 (1953) (lack of formal public control over election primary "immaterial" to analysis of constitutional violation).

- The "five-foot-tall white cross" in the Mojave National Preserve is designated as a "national memorial."

- The transfer of land to the VFW is conditioned on the VFW's maintenance of the conveyed property as a memorial to World War I veterans.

- The Secretary must carry out its duties under § 8137, which provides $10,000 for NPS to acquire and install replicas of the original cross and plaque.

- The property "shall revert" to government ownership if "it is no longer being maintained as a war memorial."

The government retains various rights of control over the cross and the property. NPS is granted statutory powers of "supervision, management, and control" of national memorials. *See* 16 U.S.C. §§ 2, 431. Thus, NPS's general supervisory and managerial responsibilities with respect to the cross remain, despite a land transfer. *See, e.g.*, 16 U.S.C. § 1 (providing that the newly created NPS is responsible for regulating and promoting "national parks, monuments, and reservations . . . by such means and measures as conform to the fundamental purpose" of conservation); 16 U.S.C. § 3 ("The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of [NPS].").[14]

[8] In addition, § 8121(a) expressly reserves NPS's management responsibilities under § 8137. *See* § 8121(a)

---

[14]The government does not dispute that the Preserve is under NPS's jurisdiction as a unit of the national park system. *See* 16 U.S.C. §§ 1(c), 410*aaa*-41, 410*aaa*-42, 410aaa-46.

("Notwithstanding the conveyance of the property under this subsection, the Secretary shall continue to carry out the responsibilities of the Secretary under such section 8137."). Section 8137 not only designates the cross a national memorial, but provides for $10,000 in funds for NPS to acquire and install replicas of the original plaque and cross located at the site. *See* § 8137(a)-(c). The district court found that these provisions gave the government an easement or license over the subject property for this particular purpose. *Buono III*, 364 F. Supp. 2d at 1180. Such an easement or license reflects ongoing control over the property requiring compliance with constitutional requirements on that land. *See, e.g.*, *First Unitarian Church of Salt Lake v. Salt Lake*, 308 F.3d 1114, 1122 (10th Cir. 2002) (holding that where the government sells land to a private religious organization but maintains a pedestrian easement on the land, the First Amendment speech clause applies even though the private party holds title to the land).

[9] The district court also focused on the significance of the government's retention of a reversionary interest in the property under § 8121(e). *See Hampton v. City of Jacksonville*, 304 F.2d 320, 322-23 (5th Cir. 1962) (holding that the inclusion of a reversionary clause in deeds to segregated golf courses conveyed by the city to private parties was sufficient state action to bring the golf courses within the Fourteenth Amendment because the reversionary clauses allowed the city to exercise "complete present control" over the golf courses); *Eaton v. Grubbs*, 329 F.2d 710, 714 (4th Cir. 1964) (holding that a reverter clause in a deed of trust allowed the city to effectively exercise control of the facility to ensure that it was always used "as a hospital," and that such ongoing city control over use of property constituted sufficient state action to subject the hospital to the Fourteenth Amendment's prohibitions against racial discrimination). As in *Hampton* and *Eaton*, the reversionary clause in § 8121(e) results in ongoing government control over the subject property, even after the transfer.

Although the government argues that reversionary interests are run-of-the mill clauses in contracts with the government, the commonality of such clauses does not diminish their power or effect. The fact remains that the government has an *automatic* reversionary interest in the property if it determines that the property is no longer being used as a "war memorial," which, at this juncture, is the cross itself. *See* § 8137. *See also Buono II*, 371 F.3d at 546 (noting the importance of the government's reversionary interest, and various other mechanisms by which the government can acquire public lands, in concluding that the dispute had not been rendered moot by passage of § 8121).

As it did with respect to ripeness, the government argues that the court must await exercise of the reversionary interest before determining whether it is a real factor in government control over the property. We reiterate the import of the reversionary interest; it shows the government's ongoing control over the property and that the parties will conduct themselves in the shadow of that control. The courts in *Hampton* and *Eaton* found dispositive the ongoing control resulting from the reversionary interest; their analysis is persuasive here.

**[10]** Based on the government's ongoing supervisory, maintenance and oversight responsibilities with respect to the cross and the property, coupled with the reversionary interest, the district court found that the government retains important property rights in, and "will continue to exercise substantial control over," the property on which Sunrise Rock is located, even after the land exchange. *Id.* at 1179. The government has failed to show that this determination is either clearly erroneous or an abuse of discretion.

## 2.   Method for Effectuating the Land Exchange

Next, we examine the method of sale by which § 8121 transfers the property to a private buyer outside the normal NPS procedures for transfer of parklands. The Secretary of

DOI is authorized to exchange federal land for non-federal land under its jurisdiction. *See* 16 U.S.C. § 460*l*-22(b); *see also* § 410*aaa* 56 (authorizing the Secretary to "acquire all lands and interest in lands within the boundary of the [Mojave] preserve by donation, purchase, or exchange"). In this case, however, the decision to exchange the land was made by Congress and authorized by a provision buried in an appropriations bill. The government did not hold a hearing before enacting such exchange. *E.g., id.* § 460*l*-22(b) (providing that upon request, "prior to such exchange the Secretary . . . shall hold a public hearing in the area where the lands to be exchanged are located"). Nor did the government open bidding to the general public. *E.g.*, *id.* § 460*l*-22(a). Rather, § 8121 directs that the land be transferred to the VFW, the organization that originally installed a cross on Sunrise Rock some years ago and desires the continued presence of the current cross in the Preserve. The private land being exchanged for the federal property is owned by the Sandozes, who constructed the present cross and who have actively sought to keep the cross on Sunrise Rock. *Buono III*, 364 F. Supp. 2d at 1180.

The government argues that, of all parties, the VFW is the "logical purchaser" because it originally erected the cross at the site more than seventy years ago. The government cites *Marshfield* and another Seventh Circuit case, *Mercier v. Fraternal Order of Eagles*, 395 F.3d 693 (7th Cir. 2005). In both cases, the respective courts upheld the sale of property to a private party without an open market bidding process for the land. *Marshfield*, 203 F.3d at 489-90; *Mercier*, 395 F.3d at 694-95, 702-03.

**[11]** Although neither the exclusion of other purchasers, nor the fact that Congress acted outside the scope of normal agency procedures for disposing of federal park land is dispositive, both acts demonstrate the government's unusual involvement in this transaction. These facts, coupled with the government's selection of beneficiaries of the land exchange

who have a significant interest and personal investment in preserving the cross that has been ordered removed, provide additional evidence that the government is seeking to circumvent the injunction in this case. We see no basis to upset the district court's conclusion that the VFW was a straw purchaser. *Id.* at 1181.

### 3. HISTORY OF THE GOVERNMENT'S PRESERVATION EFFORTS

[12] Finally, the government's long-standing efforts to preserve and maintain the cross atop Sunrise Rock lead us to the undeniable conclusion that the government's purpose in this case is to evade the injunction and keep the cross in place. In brief, when litigation was first threatened against NPS, Congress banned the use of government funds to remove the cross (§ 133), the first step in forestalling inevitable enforcement of a federal injunction. After litigation commenced, Congress designated the cross and adjoining Preserve property as a national memorial commemorating World War I (§ 8137). Congress also appropriated up to $10,000 for NPS to acquire replicas of the original cross and plaque at the site (*id.*), once more trying to bolster the presence of the cross. Once the district court enjoined display of the cross in *Buono I*, Congress again prohibited the use of federal funds to remove any World War I memorials (which, obviously, includes the cross) (§ 8056(b)); and, while the appeal was pending in *Buono II*, Congress enacted § 8121, directing the transfer of the subject property to a private organization, but maintaining effective government control over the memorial and the use of that property.

The government does not contest these legislative responses to various stages of the litigation in this case, or their purpose aimed at preserving the cross. Rather, the government attempts to diminish their importance. For example, the government argues that § 8137(c), which earmarks funds for the replica plaque and cross, was passed before the district

court's injunction and that after the injunction, DOI has taken no action to acquire the replicas. While this may be true, when Congress enacted § 8121, it specifically incorporated the Secretary's duty to carry out the responsibilities set out in § 8137; Congress did not repeal the funding provisions, or any other provision permitting ongoing government control. The funding provisions offer historical evidence of the governmental responses aimed at preserving the cross, as well as ongoing legislative authorizations. In that context, it does not matter whether DOI has exercised its powers to obtain such replicas; the important fact is that Congress directed that it do so, further showing its intent to preserve and maintain the cross.

We agree with the district court that the government engaged in "herculean efforts" to preserve the cross atop Sunrise Rock. *Buono III*, 364 F. Supp. 2d at 1182. We also agree that "the proposed transfer of the subject property can only be viewed as an attempt to keep the Latin Cross atop Sunrise Rock without actually curing the continuing Establishment Clause violation." *Id.*

## B. CONTINUING GOVERNMENTAL ENDORSEMENT OF RELIGION

Our inquiry into a purported cure of an Establishment Clause violation must also analyze whether the improper governmental endorsement of religion has ceased. *See, e.g., Marshfield*, 203 F.3d at 493-96. Because of the procedural posture of this case, we have necessarily already considered that question. We previously held that the presence of the cross in the Preserve violates the Establishment Clause. *See Buono II*, 371 F.3d at 548-50. We also concluded that a reasonable observer aware of the history of the cross would know of the government's attempts to preserve it and the denial of access to other religious symbols. *Id.* at 550. Even a less informed reasonable observer would perceive governmental endorsement of the message, given that "[n]ational parklands and preserves

embody the notion of government ownership," that the Sunrise Rock area is used as a public campground, and finally, because of "the ratio of publicly-owned to privately-owned land in the Preserve." *Id.* Nothing in the present posture of the case alters those earlier conclusions. Under the statutory dictates and terms that presently stand, carving out a tiny parcel of property in the midst of this vast Preserve—like a donut hole with the cross atop it—will do nothing to minimize the impermissible governmental endorsement. Nor does the proposed land exchange under § 8121 end the improper government action. Such a transfer cannot be validly executed without running afoul of the injunction.

**[13]** In sum, the government has not shown the district court's factual findings to be clearly erroneous. Nor has the government shown that the district court applied erroneous legal standards. Finally, the district court's decision does not reflect any clear error of judgment. The district court did not abuse its discretion in enjoining the government from proceeding with the land exchange under 16 U.S.C. § 8121 and ordering the government to otherwise comply with its prior injunction that it not permit the display of the Sunrise Rock cross in the Preserve.

**AFFIRMED.**