Justice Stevens,
with whom Justice Ginsburg and Justice Sotomayor join, dissenting.
In 2002 Congress designated a “five-foot-tall white cross” located in the Mojave National Preserve (Preserve) “as a national memorial commemorating United States participation in World War I and honoring the American veterans of that war.” Department of Defense Appropriations Act, Pub. L. 107-117, § 8137(a), 115 Stat. 2278. Later that year, in a judgment not open to question, the District Court determined that the display of that cross violated the Establishment Clause because it “convey[ed] a message of endorsement of religion.” Buono v. Norton, 212 F. Supp. 2d 1202, 1217 (CD Cal. 2002) (Buono I). The question in this case is whether Congress’ subsequent decision to transfer ownership of the property underlying the cross cured that violation.
“The Establishment Clause, if nothing else, prohibits government from ‘specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ.’ ” Van Orden v. Perry, 545 *736 U. S. 677, 718 (2005) (Stevens, J., dissenting) (quoting Lee v. Weisman, 505 U. S. 577, 641 (1992) (Scalia, J., dissenting)). A Latin cross necessarily symbolizes one of the most important tenets upon which believers in a benevolent Creator, as well as nonbelievers, are known to differ. In my view, the District Court was right to enforce its prior judgment by enjoining Congress’ proposed remedy — a remedy that was engineered to leave the cross intact and that did not alter its basic meaning. I certainly agree that the Nation should memorialize the service of those who fought and died in World War I, but it cannot lawfully do so by continued endorsement of a starkly sectarian message.
I
As the history recounted by the plurality indicates, this case comes to us in a procedural posture that significantly narrows the question presented to the Court. In the first stage of this litigation, the District Court and the Court of Appeals ruled that the Government violated the Establishment Clause by permitting the display of a single white Latin cross at Sunrise Rock. Those courts further ruled that the appropriate remedy was an injunction prohibiting the Government from “permitting the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve.” App. 39. The Government declined to seek a writ of certiorari following those rulings. Accordingly, for the purpose of this case, it is settled that “the Sunrise Rock cross will project a message of government endorsement [of religion] to a reasonable observer,” Buono v. Norton, 371 F. 3d 543, 549 (CA9 2004) (Buono II), and that the District Court’s remedy for that endorsement was proper.
We are, however, faced with an additional fact: Congress has enacted a statute directing the Secretary of the Interior to transfer a 1-acre parcel of land containing the cross to the Veterans of Foreign Wars (VFW), subject to certain conditions, in exchange for a 5-acre parcel of land elsewhere in the *737 Preserve. See Department of Defense Appropriations Act, 2004, Pub. L. 108-87, §8121, 117 Stat. 1100. The District Court found that the land transfer under §8121 “violate[d] [the] court’s judgment ordering a permanent injunction” and did not “actually cur[e] the continuing Establishment Clause violation.” Buono v. Norton, 364 F. Supp. 2d 1175, 1182 (CD Cal. 2005) (Buono III). The District Court therefore enforced its 2002 judgment by enjoining the transfer, without considering whether “the land transfer itself is an independent violation of the Establishment Clause.” Ibid., n. 8. Because the District Court did not base its decision upon an independent Establishment Clause violation, the constitutionality of the land-transfer statute is not before us. See ante, at 714. Instead, the question we confront is whether the District Court properly enforced its 2002 judgment by enjoining the transfer.
In answering that question we, like the District Court, must first consider whether the transfer would violate the 2002 injunction. We must then consider whether changed circumstances nonetheless rendered enforcement of that judgment inappropriate; or conversely whether they made it necessary for the District Court to bar the transfer, even if the transfer is not expressly prohibited by the prior injunction, in order to achieve the intended objective of the injunction. The plurality correctly notes that “‘a court must never ignore significant changes in the law or circumstances underlying an injunction,’” ibid, (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2961, pp. 393-394 (2d ed. 1995) (hereinafter Wright & Miller)), and “ ‘[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need,’” ante, at 718 (quoting United States v. Swift & Co., 286 U. S. 106, 114 (1932)).[1] At the same time, *738 it is axiomatic that when a party seeks to enforce or modify an injunction, the only circumstances that matter are changed circumstances. See Swift, 286 U. S., at 119 (“The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making”).
I further accept that the District Court’s task was to evaluate the changed circumstances “in light of the objectives of the 2002 injunction.” Ante, at 720. This case does not simply pit a plaintiff's “prior showing of illegality” against a defendant’s claim that “changed circumstances have rendered prospective relief inappropriate. ” Ante, at 718. That formulation implies that the changed circumstances all cut in one direction, against prospective relief, and that the defendant has asked the court to alleviate its obligations. But it is important to note that in this case, the Government did not move to “alleviate or eliminate conditions or restrictions imposed by the original decree” so as to permit the transfer. Wright & Miller §2961, at 397. Rather, it was the beneficiary of the original injunction who went back into court seeking its enforcement or modification in light of the transfer. Plainly, respondent had standing to seek enforcement of a decree in his favor.[2]
*739 Respondent argued that such action was necessary, either to enforce the plain terms of the 2002 injunction or to “achieve the purposes of the provisions of the decree,” United States v. United Shoe Machinery Corp., 391 U. S. 244, 249 (1968); see Wright & Miller § 2961, at 393 (“[A] court must continually be willing to redraft the order at the request of the party who obtained equitable relief in order to insure that the decree accomplishes its intended result”). Only at that point did the Government argue that changed circumstances made prospective relief unnecessary. This difference in focus is a subtle one, but it is important to emphasize that the question that was before the District Court — and that is now before us — is whether enjoining the transfer was necessary to effectuate the letter or logic of the 2002 judgment.
Although I agree with the plurality's basic framework, I disagree with its decision to remand the case to the District Court. The District Court already “engagefd] in the appropriate inquiry,” ante, at 715, and it was well within its rights to enforce the 2002 judgment. First, the District Court *740 properly recognized that the transfer was a means of “permitting” — indeed, encouraging — the display of the cross. The transfer therefore would violate the terms of the court’s original injunction. Second, even if the transfer would not violate the terms of the 2002 injunction, the District Court properly took into account events that transpired since 2002 and determined that barring the transfer was necessary to achieve the intended result of the 2002 decree, as the transfer would not eliminate government endorsement of religion.
II
The first step in the analysis is straightforward: The District Court had to ask whether the transfer of the property would violate the extant injunction. Under the terms of that injunction, the answer was yes.
The 2002 injunction barred the Government from “permitting the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve.” App. 39. The land-transfer statute mandated transfer of the land to an organization that has announced its intention to maintain the cross on Sunrise Rock. That action surely “permitís]” the display of the cross. See 11 Oxford English Dictionary 578 (2d ed. 1989) (defining “permit” as “[t]o admit or allow the doing or occurrence of; to give leave or opportunity for”). True, the Government would no longer exert direct control over the cross. But the transfer itself would be an act permitting its display.
I therefore disagree with Justice Scalia that the “only reasonable reading of the original injunction ... is that it proscribed the cross’s display on federal land.” Ante, at 730. If the land were already privately owned, Justice Scalia may be correct that the cross’ display on Sunrise Rock would not violate the injunction because the Government would not have to do anything to allow the cross to stand, and the Government could try to prevent its display only by making such *741 a display illegal. But the Government does own this land, and the transfer statute requires the Executive Branch to take an affirmative act (transfer to private ownership) designed to keep the cross in place. In evaluating a claim that the Government would impermissibly “permit” the cross’ display by effecting a transfer, a court cannot start from a baseline in which the cross has already been transferred.
Moreover, §8121 was designed specifically to foster the display of the cross. Regardless of why the Government wanted to “accommodatfe]” the interests associated with its display, ante, at 717 (plurality opinion), it was not only foreseeable but also intended that the cross would remain standing. Indeed, so far as the record indicates, the Government had no other purpose for turning over this land to private hands. It was therefore proper for the District Court to find that the transfer would violate its 2002 injunction and to enforce that injunction against the transfer.
III
As already noted, it was respondent, the beneficiary of the injunction, who moved the District Court for relief. When the beneficiary of an injunction seeks relief “to achieve the purposes of the provisions of the decree,” United Shoe Machinery Corp., 391 U. S., at 249, a district court has the authority to “modify the decree so as to achieve the required result with all appropriate expedition,” id., at 252. Thus, regardless of whether the transfer was prohibited by the plain terms of the 2002 judgment, the District Court properly inquired into whether enjoining the transfer was necessary to achieve the objective of that judgment. The Government faces a high burden in arguing the District Court exceeded its authority. A decree “may not be changed in the interests of the defendants if the purposes of the litigation... have not been fully achieved.” Id., at 248 (emphasis deleted). And contrary to the Government’s position, *742 the changed circumstances in this case support, rather than count against, the District Court’s enforcement decision.
The objective of the 2002 judgment, as the plurality grudgingly allows, was to “avoi[d] the perception of governmental endorsement” of religion. Ante, at 720; see Buono III, 364 F. Supp. 2d, at 1178 (analyzing “ ‘whether government action endorsing religion has actually ceased’” in light of the transfer). The parties do not disagree on this point; rather, they dispute whether the transfer would end government endorsement of the cross. Compare Brief for Petitioners 21 (“Congress’s transfer of the land ... ends any governmental endorsement of the cross”) with Brief for Respondent 34 (“[T]he government’s endorsement of the Christian cross is not remedied” by the land transfer). The District Court rightly found that the transfer would not end government endorsement of the cross.
A government practice violates the Establishment Clause if it “either has the purpose or effect of ‘endorsing’ religion.” County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573, 592 (1989). “Whether the key word is ‘endorsement,’ ‘favoritism,’ or ‘promotion,’ the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from ‘making adherence to a religion relevant in any way to a person’s standing in the political community.’ ” Id., at 593-594 (quoting Lynch v. Donnelly, 465 U. S. 668, 687 (1984) (O’Connor, J., concurring)).
The 2002 injunction was based on a finding that display of the cross had the effect of endorsing religion. That is, “the Sunrise Rock cross . . . projects] a message of government endorsement [of religion] to a reasonable observer.” Buono II, 371 F. 3d, at 549. The determination that the Government had endorsed religion necessarily rested on two premises: first, that the Government endorsed the cross, and *743 second, that the cross “take[s] a position on questions of religious belief” or “ 'mak[es] adherence to a religion relevant . . . to a person’s standing in the political community,’” County of Allegheny, 492 U. S., at 594. Taking the District Court’s 2002 finding of an Establishment Clause violation as res judicata, as we must, the land transfer has the potential to dislodge only the first of those premises, in that the transfer might change the Government’s endorsing relationship with the cross. As I explain below, I disagree that the transfer ordered by §8121 would in fact have this result. But it is also worth noting at the outset that the transfer statute could not (and does not) dislodge the second premise — that the cross conveys a religious message. Continuing government endorsement of the cross is thus continuing government endorsement of religion.
In my view, the transfer ordered by § 8121 would not end government endorsement of the cross for two independently sufficient reasons. First, after the transfer it would continue to appear to any reasonable observer that the Government has endorsed the cross, notwithstanding that the name has changed on the title to a small patch of underlying land. This is particularly true because the Government has designated the cross as a national memorial, and that endorsement continues regardless of whether the cross sits on public or private land. Second, the transfer continues the existing Government endorsement of the cross because the purpose of the transfer is to preserve its display. Congress’ intent to preserve the display of the cross maintains the Government’s endorsement of the cross.
The plurality does not conclude to the contrary; that is, it does not decide that the transfer would end government endorsement of the cross and the religious message it conveys. Rather, the plurality concludes that the District Court did not conduct an appropriate analysis, and it remands the case for a do-over. I take up each of the purported faults the plurality finds in the District Court’s analy *744 sis in my examination of the reasons why the transfer does not cure the existing Establishment Clause violation.

Perception of the Cross Post-Transfer

The 2002 injunction was based upon a finding of impermissible effect: The “Sunrise Rock cross ... projeet[s] a message of government endorsement [of religion] to a reasonable observer.” Buono II, 371 F. 3d, at 549. The transfer would not end that impermissible state of affairs because the cross, post-transfer, would still have “the effect of communicating a message of government endorsement ... of religion.” Lynch, 465 U. S., at 692 (O’Connor, J., concurring). As the Court of Appeals correctly found, “[n]othing in the present posture of the case alters” the conclusion that a “reasonable observer would perceive governmental endorsement of the message” the cross conveys. Buono v. Kempthorne, 527 F. 3d 758, 783 (CA9 2008) (Buono IV).[3]
*745 In its original judgment, the Court of Appeals found that a well-informed reasonable observer would perceive government endorsement of religion, notwithstanding the cross’ initial “placement by private individuals,” based upon the following facts: “that the cross rests on public land[,]. . . that Congress has designated the cross as a war memorial and prohibited the use of funds to remove it, and that the Park Service has denied similar access for expression by an adherent of the ... Buddhist faith.” Buono II, 371 F. 3d, at 550. After the transfer, a well-informed observer would know that the cross was no longer on public land, but would additionally be aware of the following facts: The cross was once on public land, the Government was enjoined from permitting its display, Congress transferred it to a specific purchaser in order to preserve its display in the same location, and the Government maintained a reversionary interest in the land. From this chain of events, in addition to the factors that remain the same after the transfer, he would perceive government endorsement of the cross.[4]
Particularly important to this analysis is that although the transfer might remove the implicit endorsement that presence on public land signifies, see Capitol Square Review and Advisory Bd. v. Pinette, 515 U. S. 753, 801 (1995) (Stevens, J., dissenting) (“The very fact that a sign is installed on public property implies official recognition and reinforcement of its message”), it would not change the fact that the Government has taken several explicit actions to endorse this cross. In its decision upholding the initial entry of the injunction, the Court of Appeals found those actions contributed to a *746 reasonable observer's perception of government endorsement. Buono II, 371 F. 3d, at 550. Their significance does not depend upon the ownership of the land.
In 2000, and again after the District Court had entered its initial injunction, Congress passed legislation prohibiting the use of any federal funds to remove the cross from its location on federal property. See Consolidated Appropriations Act, 2001, Pub. L. 106-554, §133, 114 Stat. 2763A-230; Department of Defense Appropriations Act, 2003, Pub. L. 107-248, § 8065(b), 116 Stat. 1551. Thus, beyond merely acquiescing in the continued presence of a cross on federal property, Congress singled out that cross for special treatment, and it affirmatively commanded that the cross must remain.
Congress also made a more dramatic intervention. Without the benefit of any committee hearings or floor debate in either the Senate or the House of Representatives — indeed, without a moment of discussion in any official forum — Congress passed legislation officially designating the “five-foot-tall white cross” in the Mojave Desert “as a national memorial commemorating United States participation in World War I and honoring the American veterans of that war.” § 8137(a), 115 Stat. 2278. Thereafter, the cross was no longer just a local artifact; it acquired a formal national status of the highest order. Once that momentous step was taken, changing the identity of the owner of the underlying land could no longer change the public or private character of the cross. The Government has expressly adopted the cross as its own.[5]
*747 Even though Congress recognized this cross for its military associations, the solitary cross conveys an inescapably sectarian message. See Separation of Church and State Comm. v. Eugene, 93 F. 3d 617, 626 (CA9 1996) (O’Scannlain, J., concurring in result) (“[T]he City’s use of a cross to memorialize the war dead may lead observers to believe that the City has chosen to honor only Christian veterans”). As the District Court observed, it is undisputed that the “[L]atin cross is the preeminent symbol of Christianity. It is exclusively a Christian symbol, and not a symbol of any other religion.” Buono I, 212 F. Supp. 2d, at 1205. We have recognized the significance of the Latin cross as a sectarian symbol,[6] and no participant in this litigation denies that the cross bears that social meaning. Making a plain, unadorned Latin cross a war memorial does not make the cross secular. It makes the war memorial sectarian.[7]
*748 More fundamentally, however, the message conveyed by the cross is not open to reconsideration given the posture of this case. The plurality employs a revealing turn of phrase when it characterizes the cross as “a symbol that, while challenged under the Establishment Clause, has complex meaning beyond the expression of religious views.” Ante, at 717. The days of considering the cross itself as challenged under the Establishment Clause are over; it is settled that the government is not permitted to endorse the cross. However complex the meaning of the cross, the Court of Appeals in 2004 considered and rejected the argument that its dual symbolism as a war memorial meant that government endorsement of the cross did not amount to endorsement of religion. See Buono II, 371 F. 3d, at 549, n. 5. All we are debating at this juncture is whether the shift from public to private ownership of the land sufficiently distanced the Government from the cross; we are no longer debating the message the cross conveys to a reasonable observer. In arguing that Congress can legitimately favor the cross because of its purported double meaning, the plurality implicitly tries to reopen what is closed.[8]
*749 The plurality also poses a different objection to consideration of whether the transfer would change a reasonable observer’s perception of the cross. The plurality suggests that the “ ‘reasonable observer’ standard” may not “be the appropriate framework” because “courts considering Establishment Clause challenges do not,” as a general matter, “inquire into ‘reasonable observer’ perceptions with respeet to objects on private land.” Ante, at 720. Once again, the plurality’s approach fails to pay heed to the posture of this case.
At the risk of stating the obvious, respondent is not simply challenging a private object on private land. Although “an Establishment Clause violation must be moored in government action of some sort,” Pinette, 515 U. S., at 779 (O’Con-nor, J., concurring in part and concurring in judgment), respondent’s objection to the transfer easily meets that test for two reasons. First, he is currently challenging official legislation, taken in response to an identified Establishment Clause violation. That legislation would transfer public land to a particular private party, with the proviso that the transferee must use the land to fulfill a specific public function or else the land reverts to the Government. Second, even once the transfer is complete, the cross would remain a national memorial. The cross is therefore not a purely “private” object in any meaningful sense.
Notwithstanding these facts, the plurality appears to conclude that the transfer might render the cross purely private speech. It relies in part on the plurality opinion in Pinette for its suggestion that the reasonable observer standard may *750 not be apposite, and Pimtte addressed a privately owned cross displayed in a public forum. The Pinette plurality would have rejected the idea that “a neutrally behaving government” can ever endorse “private religious expression,” id., at 764, even if a reasonable observer would perceive government endorsement, id., at 768. But the Pinette plurality acknowledged that government favoritism of private religious speech is unconstitutional, as when a government “giv[es] sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter).” Id., at 766. And in this case, the Government is not acting neutrally: The transfer statute and the Government actions preceding it have all favored the cross.
Furthermore, even assuming (wrongly) that the cross would be purely private speech after the transfer, and even assuming (quite implausibly) that the transfer statute is neutral with respect to the cross, it would still be appropriate for the District Court to apply the reasonable observer standard. The majority of the Pinette Court rejected the per se rule proposed by the plurality. Instead, the relevant standard provides that the Establishment Clause is violated whenever “the State’s own actions ..., and their relationship to the private speech at issue, actually convey a message of endorsement.” Id., at 777 (opinion of O’Connor, J.). Moreover, the Establishment Clause “imposes affirmative obligations that may require a State, in some situations, to take steps to avoid being perceived as supporting or endorsing a private religious message.” Ibid. It is particularly appropriate in this context — when the issue is whether the transfer cures an already identified Establishment Clause violation — for the District Court to consider whether the Government, by complying with §8121, would have taken sufficient steps to avoid being perceived as endorsing the cross.
As I explained at the outset of this section, the answer to that inquiry is surely no. The reasonable observer “who *751 knows all of the pertinent facts and circumstances surrounding the symbol and its placement,” ante, at 721, would perceive that the Government has endorsed the cross: It prohibited the use of federal funds to take down the cross, designated the cross as a national memorial, and engaged in “herculean efforts to preserve the Latin Cross” following the District Court’s initial injunction, Buono III, 364 F. Supp. 2d, at 1182. Those efforts include a transfer statute designed to keep the cross in place. Changing the ownership status of the underlying land in the manner required by §8121 would not change the fact that the cross conveys a message of government endorsement of religion.

Purpose in Enacting the Transfer Statute

Even setting aside that the effect of the post-transfer cross would still be to convey a message of government endorsement of religion, the District Court was correct to conclude that §8121 would not cure the Establishment Clause violation because the very purpose of the transfer was to preserve the display of the cross. That evident purpose maintains government endorsement of the cross. The plurality does not really contest that this was Congress’ purpose, ante, at 715, so I need not review the evidence in great detail. Suffice it to say that the record provides ample support. The land-transfer statute authorizes a conveyance to the particular recipient that has expressed an intent to preserve the cross. See Brief for VFW et al. as Amici Curiae 4 (transfer recipient “intends to maintain and preserve the Veterans Memorial”); id., at 7 (identifying Veterans Memorial as the “cross and plaque”). And it conveys the particular land that has already been designated “as a national memorial” commemorating the veterans of World War I, § 8121(a), 117 Stat. 1100, subject to a reversionary clause requiring that a memorial “commemorating United States participation in World War I and honoring the American veterans of that war” be *752 maintained, § 8121(e), ibid. If it does not categorically require the new owner of the property to display the existing memorial meeting that description (the cross), see §8137,115 Stat. 2278, the statute most certainly encourages this result. Indeed, the Government concedes that Congress sought to “preserve a longstanding war memorial” at the site, Brief for Petitioners 28 (emphasis added), and the only memorial that could be “preserved” at Sunrise Eock is the cross itself.
The plurality insists, however, that even assuming the purpose of the land transfer was to preserve the display of the cross, enjoining the transfer was not necessarily appropriate. It contends the District Court failed to give adequate consideration to “the context in which the [land-transfer] statute was enacted and the reasons for its passage,” ante, at 715, and it directs the District Court's attention to three factors: the message intended by the private citizens who first erected the cross, ibid.; the time the cross stood on Sunrise Rock and its historical meaning, ante, at 716; and Congress' balancing of “opposing interests” and selection of a “policy of accommodation,” ante, at 716-717; see also ante, at 721.
The first two of these factors are red herrings. The District Court, in its enforcement decision, had no occasion to consider anew either the private message intended by those who erected the cross or how long the cross had stood atop Sunrise Rock. Neither of these factors constituted a novel or changed circumstance since the entry of the 2002 injunction. Whatever message those who initially erected the cross intended — and I think we have to presume it was a Christian one, at least in part, for the simple reason that those who erected the cross chose to commemorate American veterans in an explicitly Christian manner — that historical fact did not change between 2002 and 2005. I grant that the amount of time the cross had stood on Sunrise Rock did change, from 68 years to 71 years, but no one can seriously maintain that “the historical meaning that the cross had at *753 tained,” ante, at 716, was materially transformed in that 3-year increment.[9]
This brings us to the final factor identified by the plurality: Congress’ “policy of accommodation” for the cross.[10] Of course, the District Court did consider Congress’ “policy” in the sense that it considered the result Congress was trying to achieve with respect to the cross, i. e., to keep it in place. See Buono III, 364 F. Supp. 2d, at 1182 (“[T]he proposed transfer of the subject property can only be viewed as an attempt to keep the Latin cross atop Sunrise Rock without actually curing the continuing Establishment Clause violation”). But I understand the plurality to be faulting the *754 District Court for failing to inquire into a deeper level of motivation: If the purpose of the transfer was to keep the cross in place, what was the purpose of keeping the cross in place?
I do not see why it was incumbent upon the District Court to examine this second-order purpose when determining whether the transfer violated the 2002 injunction. As discussed in Part II, supra, the injunction barred the Government from permitting the display of the cross, which fairly encompasses any act providing an opportunity for the cross’ display. It was entirely appropriate for the District Court to characterize a transfer with the purpose of preserving the cross as an attempt to evade that injunction, and to find that the Government’s purpose to preserve the cross maintains government endorsement of the cross.
The plurality would have the District Court revise its entire analysis of whether the transfer would end government endorsement, in light of the plurality’s view of the land-transfer statute’s putative second-order purpose. That analysis ignores the procedural posture of the case. If the question before the Court were whether § 8121 itself violated the Establishment Clause, then this argument might have merit. But we are instead examining whether action taken with the purpose of preserving the display of the cross cures or continues government endorsement. In my view, that purpose continues the impermissible endorsement of — indeed, favoritism toward — the cross, regardless of why Congress chose to intervene as it did.
In any event, Congress’ second-order purpose does little for the plurality’s position. Without relying on any legislative history or findings — there are none — the plurality opines that Congress wanted to keep the cross in place in order to accommodate those who might view removal as “conveying disrespect for those the cross was seen as honoring,” ante, at 716, and it suggests that this decision was an acceptable method of “balanc[ing] opposing interests” be *755 cause the cross “has complex meaning beyond the expression of religious views,” ante, at 717. As I have already explained, the meaning of the cross (complex or otherwise) is no longer before us, and the plurality’s reliance on a “congressional statement of policy,” ibid., as negating any government endorsement of religion finds no support in logic or precedent. The cross cannot take on a nonsectarian character by congressional (or judicial) fiat, and the plurality’s evaluation of Congress’ actions is divorced from the methodology prescribed by our doctrine.[11]
Our precedent provides that we evaluate purpose based upon what the objective indicia of intent would reveal to a reasonable observer. See McCreary County v. American Civil Liberties Union of Ky., 545 U. S. 844, 862 (2005) (“The eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act” (internal quotation *756 marks omitted». “[Reasonable observers have reasonable memories, and our precedents sensibly forbid an observer ‘to turn a blind eye to the context in which [the] policy arose.’ ” Id., at 866 (quoting Santa Fe Independent School Dist. v. Doe, 530 U. S. 290, 315 (2000)). The plurality nowhere engages with how a reasonable observer would view Congress’ “policy of accommodation” for this cross. Instead, the plurality insists that deference is owed because of “Congress’ prerogative to balance opposing interests and its institutional competence to do so.” Ante, at 717.
The proper remedy for an Establishment Clause violation is a legal judgment, which is not the sort of issue for which Congress “ ‘has both wisdom and experience . . . that is far superior to ours.’” Citizens United v. Federal Election Comm’n, 558 U. S. 310, 461 (2010) (Stevens, J., concurring in part and dissenting in part) (quoting Colorado Republican Federal Campaign Comm. v. Federal Election Comm’n, 518 U. S. 604, 650 (1996) (Stevens, J., dissenting)). Moreover, the inference that Congress has exercised its institutional competence — or even its considered judgment — is significantly weaker in a case such as this, when the legislative action was “buried in a defense appropriations bill,” Buono III, 364 F. Supp. 2d, at 1181, and, so far as the record shows, undertaken without any deliberation whatsoever. I am not dismissive of Congress, see ante, at 728 (opinion of Alito, J.), but §8121 presents no factual findings, reasoning, or long history of “‘careful legislative adjustment,’” Citizens United, 558 U. S., at 461 (opinion of Stevens, J.) (quoting Federal Election Comm’n v. Beaumont, 539 U. S. 146, 162, n. 9 (2003)), to which I could possibly defer. Congress did not devote “years of careful study” to § 8121, Citizens United, 558 U. S., at 463 (opinion of Stevens, J.), nor did it develop a record of any kind, much less an exhaustive one, see id., at 411-412 (noting the legislative record for the Bipartisan Campaign Reform Act of 2002 spanned 100,000 *757 pages). The concurrence’s attempt to draw an equivalence between a provision tucked silently into an appropriations bill and a major statute debated and developed over many years is, to say the least, not persuasive. All legislative acts are not fungible.
Furthermore, in the Establishment Clause context, we do not accord any special deference to the legislature on account of its generic advantages as a policymaking body, and the purpose test is not “satisfied so long as any secular purpose for the government action is apparent,” McCreary County, 545 U. S., at 865, n. 13 (emphasis added). Nor can the government pursue a secular aim through religious means. See Van Orden, 545 U. S., at 715 (Stevens, J., dissenting) (“Though the State of Texas may genuinely wish to combat juvenile delinquency, and may rightly want to honor the Eagles for their efforts, it cannot effectuate these admirable purposes through an explicitly religious medium”). It is odd that the plurality ignores all of these well-settled principles in exalting this particular legislative determination.
A reasonable observer, considering the nature of this symbol, the timing and the substance of Congress’ efforts, and the history of the Sunrise Rock site, could conclude that Congress chose to preserve the cross primarily because of its salience as a cross. C£ McCreary County, 545 U. S., at 873 (“If the observer had not thrown up his hands, he would probably suspect that the Counties were simply reaching for any way to keep a religious document on the walls . . . ”). But no such conclusion is necessary to find for respondent.[12] *758 The religious meaning of the cross was settled by the 2002 judgment; the only question before us is whether the Government has sufficiently distanced itself from the cross to end government endorsement of it. At the least, I stress again, a reasonable observer would conclude that the Government’s purpose in transferring the underlying land did not sufficiently distance the Government from the cross. Indeed, §8121 evidenced concern for whether the cross would be displayed. The District Court was therefore correct to find that the transfer would not end government endorsement of religion.
IV
In sum, I conclude that the transfer ordered by § 8121 will not end the pre-existing Government endorsement of the cross, and to the contrary may accentuate the problem in some respects. Because the transfer would perpetuate the Establishment Clause violation at issue in the 2002 injunction, I further conclude that enjoining the transfer was necessary to secure relief. Given the transfer statute’s fundamental inadequacy as a remedy, there was — and is — no need for the District Court to consider “less drastic relief than complete invalidation of the . . . statute.” Ante, at 722. Allowing the transfer to go forward would interfere with the District Court's authority to enforce its judgment and deprive the District Court of the ability to ensure a complete remedy. Nor could allowing the transfer to go forward be made a complete remedy with add-on measures, such as signs or fences indicating the ownership of the land. Such measures would not completely end the government endorsement of this cross, as the land would have been transferred in a manner favoring the cross and the cross would remain designated as a national memorial. Enjoining corn *759 pliance with §8121 was therefore a proper exercise of the District Court’s authority to enforce the 2002 judgment.
* * *
Congressional action, taken after due deliberation, that honors our fallen soldiers merits our highest respect. As far as I can tell, however, it is unprecedented in the Nation’s history to designate a bare, unadorned cross as the national war memorial for a particular group of veterans. Neither the Korean War Memorial, the Vietnam War Memorial, nor the World War II Memorial commemorates our veterans’ sacrifice in sectarian or predominantly religious ways. Each of these impressive structures pays equal respect to all members of the Armed Forces who perished in the service of our country in those conflicts. In this case, by contrast, a sectarian symbol is the memorial. And because Congress has established no other national monument to the veterans of the Great War, this solitary cross in the middle of the desert is the national World War I memorial. The sequence of legislative decisions made to designate and preserve a solitary Latin cross at an isolated location in the desert as a memorial for those who fought and died in World War I not only failed to cure the Establishment Clause violation but also, in my view, resulted in a dramatically inadequate and inappropriate tribute.
I believe that most judges would find it to be a clear Establishment Clause violation if Congress had simply directed that a solitary Latin cross be erected on the Mall in the Nation’s Capital to serve as a World War I memorial. Congress did not erect this cross, but it commanded that the cross remain in place, and it gave the cross the imprimatur of Government. Transferring the land pursuant to §8121 would perpetuate rather than cure that unambiguous endorsement of a sectarian message.
The Mojave Desert is a remote location, far from the seat of our Government. But the Government’s interest in hon *760 oring all those who have rendered heroic public service regardless of creed, as well as its constitutional responsibility to avoid endorsement of a particular religious view, should control wherever national memorials speak on behalf of our entire country.
I respectfully dissent.

 One point of contention: I accept as a general matter that a court must consider whether “legislative action has undermined the basis upon which relief has previously been granted.” Ante, at 718. But the effect of the *738 legislative action in this case is different from its effect in our cases espousing that principle, which stand for the proposition that if a statutory “right has been modified by the competent authority” since the decree, then an injunction enforcing the prior version of that right must be modified to conform to the change in the law. Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 421, 432 (1856); see also Railway Employees v. Wright, 364 U. S. 642, 651 (1961) (“In a case like this the District Court’s authority to adopt a consent decree comes only from the statute which the decree is intended to enforce. . . . [I]t [must] be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives”). In a constitutional ease such as this, legislative action may modify the facts, but it cannot change the applicable law.

 To the extent the Government challenges respondent’s standing to seek the initial injunction, that issue is not before the Court for the reasons the *739 plurality states. See ante, at 711-712. Moreover, in my view respondent has standing even under the analysis that Justice Scaua undertakes. It is not at all “speculative,” ante, at 732 (opinion concurring in judgment), that the VFW will continue to display the cross. VFW Post 385, the beneficiary of the land transfer, has filed an amici brief in this case indicating it “intends to maintain and preserve the Veterans Memorial,” Brief for VFW et al. 4, by which it means the cross, id., at 7 (identifying the Veterans Memorial as the “cross and plaque”). Respondent did, in his amended complaint, aver that he was offended specifically “by the display of a Latin Cross on government-owned property.” App. 50. But his claimed injury is that he is “unable to freely use the area of the Preserve around the cross,” Buono II, 371F. 3d 543, 547 (CA9 2004) (internal quotation marks and brackets omitted), because the Government’s unconstitutional endorsement of the cross will induce him to avoid the Sunrise Rock area, even though it offers the most convenient route to the Preserve, App. 65. That endorsement and respondent’s resulting injury not only persist, but have been aggravated by the Government’s actions since the complaint was filed.

 The plurality faults the District Court for not engaging in this analysis, but the District Court did implicitly consider how a reasonable observer would perceive the cross post-transfer when it analyzed the terms of the transfer, the Government’s continuing property rights in the conveyed land, and the history of the Government’s efforts to preserve the cross. Furthermore, the Court of Appeals affirmed the District Court’s order on the express ground that a reasonable observer would still perceive government endorsement of the cross. See Buono IV, 527 F. 3d, at 782-783.
The Chief Justice suggests this is much ado about nothing because respondent's counsel conceded that the injunction would not be violated were the Government to have gone through an “empty ritual” of taking down the cross before transferring the land. Ante, at 723 (concurring opinion). But in the colloquy to which The Chief Justice refers, counsel assumed that the Government would not retain a reversionary interest in the land, and that the cross would not retain its designation as a national memorial. See Tr. of Oral Arg. 44-45. Even under The Chief Justice’s revised version of the hypothetical, I would not so quickly decide that taking down the cross makes no material difference. And counsel’s statement takes no position as to whether the hypothetical poses any constitutional problem independent of the injunction. Regardless, we must deal with the substance of the case before us, which involves much more than Congress directing the Government to execute a simple land transfer.

 A less informed reasonable observer, see Capitol Square Review and Advisory Bd. v. Pinette, 515 U. S. 753, 807 (1995) (Stevens, J., dissenting), would reach the same conclusion because the cross would still appear to stand on Government property. The transfer merely “carv[es] out a tiny parcel of property in the midst of this vast Preserve — like a donut hole with the cross atop it.” Buono IV, 527 F. 3d 758, 783 (CA9 2008). For any reasonable observer, then, the transfer simply would not change the effect of the cross.

 The plurality barely mentions this designation, except to assert that the designation gave recognition to the historical meaning of the cross. See ante, at 716. But the plurality does not acknowledge that when the Ninth Circuit affirmed the 2002 judgment, it concluded that the designation is one of the factors that would lead a reasonable observer to perceive government endorsement of religion. See Buono II, 371 F. 3d, at 550. Nor does the plurality address the effect of that designation on a reasonable observer’s perception of the cross, regardless of whether the cross sits on private land. See ante, at 720.

 See, e. g., Pinette, 515 U. S., at 760 (characterizing Ku Klux Klan-sponsored cross as religious speech); id,., at 776 (O’Connor, J., concurring in part and concurring in judgment) (“[T]he cross is an especially potent sectarian symbol”); id., at 792 (Souter, J., concurring in part and concurring in judgment) (“[T]he Latin cross ... is the principal symbol of Christianity around the world, and display of the cross alone could not reasonably be taken to have any secular point”); .id., at 798, n. 3 (Stevens, J., dissenting) (“[T]he Latin cross is identifiable as a symbol of a particular religion, that of Christianity; and, further, as a symbol of particular denominations within Christianity”); County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573, 661 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part) (“[T]he [Establishment] Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall... because such an obtrusive year-round religious display would place the government’s, weight behind an obvious effort to proselytize on behalf of a particular religion”).

 Context is critical to the Establishment Clause inquiry, and not every use of a religious symbol in a war memorial would indicate government endorsement of a religious message. See, e. g., Van Orden v. Perry, 545 U. S. 677, 701 (2005) (Breyer, J., concurring in judgment) ("[T]o determine the message that the text here conveys, we must examine how the text is used. And that inquiry requires us to consider the context of the *748 display”); County of Allegheny, 492 U. S., at 598 (“[T]he effect of a créche display turns on its setting”); Lynch v. Donnelly, 465 U. S. 668, 694 (1984) (O’Connor, J., concurring) (“Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion”). But this cross is not merely one part of a more elaborate monument that, taken as a whole, may be understood to convey a primarily nonreligious message. Rather, the cross is the only symbol conveying any message at all.

 The plurality’s assertions regarding the meaning of the cross are therefore beside the point. For the record, however, I cannot agree that a bare cross such as this conveys a nonsectarian meaning simply because crosses are often used to commemorate “heroic acts, noble contributions, and patient striving” and to honor fallen soldiers. Ante, at 721. The cross is not a universal symbol of sacrifice. It is the symbol of one particular sacrifice, and that sacrifice carries deeply significant meaning for those who adhere to the Christian faith. The cross has sometimes been used, it is true, to represent the sacrifice of an individual, as when it marks the grave of a *749 fallen soldier or recognizes a state trooper who perished in the line of duty. Even then, the cross carries a religious meaning. But the use of the cross in such circumstances is linked to, and shows respect for, the individual honoree’s faith and beliefs. I, too, would consider it tragic if the Nation's fallen veterans were to be forgotten. See ibid. But there are countless different ways, consistent with the Constitution, that such an outcome may be averted.

 I also disagree with the plurality’s factual premise that “the cross and the cause it commemorated had become entwined in the public consciousness” in a secular manner, ante, at 716. Although some members of the community knew that the cross had been originally erected as a war memorial, there is no support in the record for the idea that members of the public “gathered regularly at Sunrise Rock to pay their respects,” ibid., to the fallen of World War I or any other veterans. The study conducted by a National Park Service historian indicates that a group of veterans gathered at the cross as early as 1935 for Easter sunrise services. Memorandum from Mark Luellen to Superintendent, Mojave National Preserve (Jan. 81, 2000), Decl. of Peter J. Eliasberg in Buono v. Norton, No. EDCV 01-216-RT (SGLx) (CD Cal., Mar. 13, 2002), p. 20 (Exh. 7). But there is no evidence that gatherings were ever held for Armistice Day or Veterans Day. The study further reveals that a local club organized social events for the community at the cross from 1950 to 1975 and that after a local veteran passed away in 1984, the “memory and associations of the white cross ... as a war memorial” faded but locals were “inspired... to reinstate the Easter sunrise services” at the cross. Ibid.

 Although the plurality uses the term “accommodation,” I do not read its opinion to suggest that Congress’ poliey vis-á-vis the cross has anything to do with accommodating any individual’s religious practice. Cf. County of Allegheny, 492 U. S., at 601, n. 51 (“Nor can the display of the creche be justified as an 'accommodation’ of religion. ... To be sure, prohibiting the display... deprives Christians of the satisfaction of seeing the government adopt their religious message as their own, but this kind of government affiliation with particular religious messages is precisely what the Establishment Clause precludes”).

 Justice Auto similarly affords great weight to Congress’ purported interest in “avoiding the disturbing symbolism associated with the destruction of the historic monument.” Ante, at 727 (opinion concurring in part and concurring in judgment). But we surely all can agree that once the government has violated the Establishment Clause, as has been adjudged in this case and is now beyond question, a plaintiff must be afforded a complete remedy. That remedy may sometimes require removing a religious symbol, and regrettably some number of people may perceive the remedy as evidence that the government “is bent on eliminating from all public places and symbols any trace of our country’s religious heritage,” ante, at 726. But it does not follow that the government can decline to cure an Establishment Clause violation in order to avoid offense. It may be the case that taking down the symbol is not the only remedy. The proper remedy, like the determination of the violation itself, is necessarily context specific, and even if it involves moving the cross, it need not involve the “demolition” or “destruction” of the cross, see ante, at 726, 727. Regardless, in this ease the only question before us is whether this particular transfer provided a complete remedy. We have no way of knowing whether Congress’ motivation was to minimize offense, but in any event that interest does not ameliorate the remedial ineffectiveness of §8121.

 I have not “jumpled] to the conclusion that Congress’ aim in enacting the land-transfer law was to embrace the religious message of the cross.” Ante, at 729 (opinion of Auto, J.). I think a reasonable observer could come to that conclusion, but my point is that so long as we agree that Congress’ aim was to preserve the cross (which Justice Auto does not dispute), Congress' reason for preserving the cross does not matter. But if we were debating whether Congress had a religious purpose in passing the transfer statute, I would contest the relevance of the vote count to that *758 inquiry, see ante, at 727, and particularly so in this case. One cannot infer much of anything about the land-transfer provision from the fact that an appropriations bill passed by an overwhelming majority.